T.C. Memo. 1996-452


UNITED STATES TAX COURT


ROBERT D. GROSSMAN, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  20526-90, 14364-91.      Filed October 7, 1996.


        P, a tax attorney, effectively controlled the daily
operations of a group of closely held corporations (C).  The
corporations were owned by P's wife (W), W's mother, and W's
brother.  In 1983 through 1986, P and W took personal
vacation trips, which P caused C to pay for.  C's payments
of the personal expenses of P and W were constructive
dividends to W.  P and W omitted to report these
constructive dividends on their 1983 through 1986 joint tax
returns.  The notices of deficiency for 1983 through 1988
were sent to P and W more than 3 years after P and W filed
their joint tax returns for 1983, 1984, and 1985.  R
contends that many of these omissions for 1983 through 1986
were due to P's fraud.  P denies the omissions, denies
fraud, and contends that, if there are deficiencies, then he
is entitled to innocent spouse treatment for 1986.

        1.    <u>Held</u>: The statute of limitations does not bar the
assessment and collection of tax for 1985, but is a bar as
to 1983 and 1984.  Sec. 6501(c)(1), I.R.C. 1954.

2.   Held, further, P is liable for fraud additions to tax for 1985 and 1986.  Sec. 6653(b)(1), I.R.C. 1954; sec. 6653(b)(1)(A), I.R.C. 1986.

3.   Held, further, P is liable for additional additions to tax for 1985 and 1986 based on the portions of the deficiencies attributable to P's fraud; amounts determined.  Sec. 6653(b)(2), I.R.C. 1954; sec. 6653(b)(1)(B), I.R.C. 1986.

4.   Held, further, P is liable for negligence additions to tax based on the portion of the 1986 deficiency that is not attributable to fraud; amounts determined.  Sec. 6653(a)(1), I.R.C. 1986.

5.   Held, further, amounts of deficiencies redetermined.

6.   Held, further, P is not entitled to innocent spouse treatment.  Sec. 6013(e), I.R.C. 1986.


Robert D. Grossman, Jr., pro se.

Stephen L. Braga and Eric F. Horvitz, for petitioner.

John C. McDougal, for respondent.


TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION................   4

FINDINGS OF FACT......................................   7

     A. Background....................................   7

     B. Sley Corporations............................  10

          1. Background...............................  11
          2. Investments..............................  12
          3. Daily Operations:  1980 through March 1986..  19
          4. Daily Operations:  After March 1986........  28

     C. Salaries and Dividends........................  30

     D. Travel and Entertainment Expenses.............  32

1. 1983......................................... 34
2. 1984......................................... 43
3. 1985......................................... 47
4. 1986......................................... 55

E. Financial Statements, Tax Returns, Audits,
   Notice of Deficiency......................... 67

F. Interest Expense for 1987..................... 78

OPINION........................................... 80

I. Statute of Limitations......................... 80

A. Underpayments of Tax.......................... 86
   (1) 1983...................................... 91
   (2) 1984...................................... 100
   (3) 1985...................................... 106
   (4) 1986...................................... 117
   (5) Conclusions............................... 119

B. Fraudulent Intent............................. 120
   (1) Petitioner's Knowledge of
       Credit Card Charges...................... 122
   (2) Petitioner's Knowledge of Payments........ 123
   (3) Petitioner's Knowledge of Berger's
       Limited Role............................. 124
   (4) Petitioner's Knowledge of the Tax Laws..... 125
   (5) Petitioner's Misleading Explanations....... 128
   (6) Other Considerations...................... 133

C. Conclusions................................... 141

II. Additions to Tax.............................. 141

A. Fifty-Percent Fraud Addition--1985............ 141
B. Additional Amount for Portion
   Attributable to Fraud--1985.................. 142
C. Fraud Additions--1986......................... 143
D. Negligence Additions--1986.................... 146

III. Amounts of Deficiencies...................... 147

A. Amount of Constructive Dividends.............. 147
B. Interest Deduction............................ 148

IV.  Innocent Spouse Relief....................... 152

- 4 -

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined deficiencies in Federal individual income tax, deficiencies in Federal excise tax under section 4973[1] (excess I.R.A. contributions), and additions to tax under sections 6653(b) (fraud) and 6661 (substantial understatement of income tax) against petitioner as follows:

| | Deficiency | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|---|
| Year | Income Tax | Excise Tax | Sec.6653 (b)(1) | Sec.6653 (b)(2) | Sec.6653 (b)(1)(A) | Sec.6653 (b)(1)(B) | Sec. 6661 |
| 1983 | $12,740 | $105 | $6,370 | [1] | -- | -- | -- |
| 1984 | 15,917 | 210 | 7,959 | [2] | -- | -- | -- |
| 1985 | 14,924 | 315 | 7,462 | [3] | -- | -- | $3,652 |
| 1986 | 6,400 | -- | -- | -- | $4,800 | [4] | -- |
| 1987 | 4,778 | 315 | -- | -- | 221 | [5] | -- |
| 1988 | 2,886 | -- | -- | -- | -- | -- | -- |

[1]  50 percent of the interest due on $12,635.
[2]  50 percent of the interest due on $3,856.
[3]  50 percent of the interest due on $14,609.
[4]  50 percent of the interest due on $6,400.
[5]  50 percent of the interest due on $294.

Respondent determined in the alternative that, if petitioner is not liable for part or all of the additions to tax for fraud for 1986, then petitioner is liable for negligence additions to tax under subparagraphs (A) and (B) of section 6653(a)(1).

Docket No. 20526-90 deals with 1986, a joint tax return year.  Docket No. 14364-91 deals with 1983, 1984, 1985, and 1987,

---

[1]     Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, or the Internal Revenue Code of 1986, as in effect for the respective years in issue.

all joint tax return years, and 1988, a separate tax return year.

The dockets are consolidated for trial, briefing, and opinion.

The joint returns were filed by petitioner and his then-wife,

Betsy Grossman, hereinafter sometimes referred to as Betsy.

After concessions[2] and deemed concessions[3] by both sides,

---

[2]    Petitioner concedes the 1988 deficiency; he also concedes the 1987 innocent spouse contention.

Respondent concedes that petitioner's taxable income should not be increased by $1,400 for each of the years 1983 through 1986 on account of the value of tax return preparation services paid on behalf of petitioner and Betsy by corporations in which Betsy owned stock.  Respondent also concedes that petitioner is not liable for additions to tax for fraud for 1987, nor is petitioner liable for excise taxes under sec. 4973 for 1983, 1984, 1985, and 1987.  On the latter issue, see, e.g., Johnson v. Commissioner, 74 T.C. 1057, 1062 (1980), affd. 661 F.2d 53 (5th Cir. 1981).

On opening brief, respondent "concedes the medical reimbursement adjustment to constructive dividends in 1983, 1984 and 1985 as de minimis."  In the notice of deficiency, respondent determined the following adjustments for medical reimbursements: An upward adjustment of $508 for 1983, a downward adjustment of $411 for 1984, and an upward adjustment of $55 for 1985. Respondent's unilateral (i.e., not by stipulation) "concession" for 1984 would increase petitioner's deficiency for this year. Respondent has not asked for an increased deficiency for 1984; see sec. 6214(a).

[3]    In the notice of deficiency, respondent disallowed Schedule W deductions under sec. 221 (the two-earner deduction) for 1983, 1984, and 1985.  Respondent also determined that petitioner's taxable income should be increased by $1,400 for 1987 for the value of tax return preparation services paid on behalf of petitioner and Betsy.  See supra note 2 as to the same issue for 1983 through 1986.  On opening brief, petitioner listed, but failed to argue these issues.  Respondent dealt with both of these issues on opening brief.  Petitioner did not deal with either of these issues on answering brief.

(continued...)

the issues for decision are as follows:

(1) Whether the assessment and collection of deficiencies and additions to tax for 1983, 1984, and 1985 are barred by the statute of limitations, section 6501(a), or are allowed under the fraud exception, section 6501(c)(1), to the general period of limitations.

(2) If assessment and collection are not barred for 1983, 1984, and 1985, then, for each of those years--

(a) whether petitioner is liable for civil fraud additions to tax under paragraphs (1) and (2) of section 6653(b) and, as to paragraph (2) of section 6653(b), in what amounts.

---

[3](...continued)
We treat petitioner's failure to argue as, in effect, a concession by petitioner of these issues. See subpars. (4) and (5) of Rule 151(e); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Money v. Commissioner, 89 T.C. 46, 48 (1987).

In the notice of deficiency, respondent disallowed deductions for contributions to an I.R.A. under sec. 219 for 1983, 1984, and 1985, and determined that petitioner is liable for an addition to tax for substantial understatement of liability under sec. 6661 for 1985. Respondent dealt with both of these issues on opening brief. Petitioner neither listed nor dealt with either of these issues on opening brief or answering brief. We conclude that petitioner has conceded these issues. See subpars. (4) and (5) of Rule 151(e); Sundstrand Corp. v. Commissioner, supra; Money v. Commissioner, supra.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

(b) what is the amount of petitioner's unreported gross income.

(3) For 1986--

(a) whether petitioner is liable for civil fraud additions to tax under subparagraphs (A) and (B) of section 6653(b)(1) and, as to subparagraph (B) of section 6653(b)(1), in what amount.

(b) what is the amount of petitioner's unreported gross income.

(c) whether petitioner qualifies for innocent spouse treatment under section 6013(e).

(4) For 1987, whether petitioner overstated an itemized interest deduction by $8,559.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petitions were filed in the instant cases, petitioner resided in Chevy Chase, Maryland.

Background

Petitioner is a sophisticated taxpayer. Petitioner is a practicing attorney; he holds a J.D. degree from the University of Florida and an LL.M. in Taxation degree from New York University. Petitioner was a senior trial attorney in the Trial

Branch of the Tax Court Litigation Division, Office of Chief Counsel, Internal Revenue Service, from 1971 through July 1975. Since July 1975, petitioner has been engaged in private practice, specializing in Federal tax law, and is currently a member of the bar of this Court. Petitioner was a name partner in the law firm of Grossman & Flask, located in Washington, D.C., during the years in issue. Petitioner does not prepare tax returns for himself or others.

Petitioner and Betsy married in 1967. They had three children, two daughters and a son, who were born in the 1970's-- RobBee (1970), Wendi (1973), and Geoffrey (1976). Petitioner and Betsy were married during the years in issue; they separated in September 1986 and divorced in 1991.

Betsy holds a bachelor of science degree from the University of Colorado and a masters degree in special education and learning disabilities from the University of Florida. In 1966, Betsy worked for the Sley Corporations, described infra. For about 2 years, Betsy was employed as a schoolteacher and earned a yearly salary of about $5,100. At some point, Betsy was employed as a substitute teacher and as a gift store clerk for "minimal" salary.

During the years in issue, petitioner and Betsy had only one joint checking account. Through September 1986, this was petitioner's only checking account. Betsy wrote and signed

almost all the checks drawn on this account.  While petitioner and Betsy were married, petitioner deposited his earnings into the joint bank account, and Betsy was responsible for spending these funds.  Betsy made the decisions regarding petitioner's and Betsy's expenditures.

Betsy is the daughter of Harry Sley, hereinafter sometimes referred to as Harry, and Beatrice Sley, hereinafter sometimes referred to as Beatrice.  Harry died on December 11, 1977. During the years in issue, Beatrice generally divided her time between Potomac, Maryland, and Miami, Florida.  From about May to November, Beatrice lived at least part of the time in a home in Potomac, which she rented from petitioner and Betsy.  From about November to May, Beatrice lived in a Miami Beach condominium that she owned.  Beatrice died in 1991.

Betsy's brother, Benjamin Harry Beryll Sley, hereinafter sometimes referred to as Ben, lived in Corpus Christi, Texas, during the years in issue.  Ben is an attorney; he holds a J.D. degree from Baylor Law School (1974) and an LL.M. in Taxation degree from Southern Methodist University (1982).[4]  He was first in his class at Southern Methodist University.  From 1975 to 1979, Ben served as a judge advocate in the U.S. Marine Corps.

---

[4]    The parties stipulated that Ben received his LL.M. in Taxation degree from New York University.  Our finding, contrary to the stipulation, is in accord with Ben's trial testimony and petitioner's proposed finding, not objected to by respondent.

During the years in issue, Ben practiced law in Texas. He is also a registered stockbroker and a consolidated life underwriter. In 1984, Ben ran for county attorney in Neuces County, Texas.

Petitioner, Betsy, and Ben grew up in the Miami, Florida, area. Petitioner and Betsy went to the same high school. Petitioner and Ben have known one another since they were children, and petitioner was best man at Ben's wedding. Petitioner's parents also lived in the Miami area during some part of the years in issue.

## Sley Corporations

### Background

Harry formed a number of corporations to conduct parking lot, garage, and real estate investment businesses in more than 60 locations in Philadelphia, Pennsylvania. In general, these corporations, hereinafter sometimes referred to collectively as the Sley Corporations, owned and operated properties at different locations.

The Sley Corporations' businesses and offices originally were located in Philadelphia; they remained in Philadelphia, until the fall of 1980, when the offices were moved to Washington, D.C. The Sley Corporations include Brine Corp., Girard Holding Co., Inc., Markette Corp. (hereinafter sometimes referred to as Markette), Parkette Corp. (hereinafter sometimes

referred to as Parkette), Chestnut Parking Corp., Locust Corp., Nine Ten Chestnut Corp., Stephen Girard Investment Corp., and Twelfth and Sansom Corp. Parkette is the administrative umbrella for the Sley Corporations.

Some of the Sley Corporations became holding companies when Harry sold some of the parking lots and garages, and kept the proceeds of the sales in those corporations.

Harry was the president of each of the Sley Corporations, and controlled them, until his death in 1977. At that time, some of the Sley Corporations were still operating as landlords. After Harry's death, Beatrice and Lorraine Hicks, hereinafter sometimes referred to as Hicks, Harry's secretary for 50 years, oversaw the investments of the Sley Corporations and continued to sell some of the lots that some of the Sley Corporations held. Hicks resigned from the Sley Corporations in the fall of 1980.

Betsy was a corporate officer of each of the Sley Corporations during the years in issue; she first became an officer of some of these corporations in the 1960's. After Harry's death, all of the stock in the Sley Corporations has been owned, either directly or beneficially (through inter vivos and testamentary trusts) by Beatrice, Betsy, and Ben. Harry intended that all the Sley Corporations stock was to be owned exclusively by Beatrice, Betsy, and Ben; he intended that in-laws, such as

petitioner, would not have an ownership interest in the Sley Corporations.

Investments

In 1978, after Harry died, Ben started to become interested in learning about investments and began going to seminars and reading financial publications. In 1979, Ben began taking an active role in the investment decisions of the Sley Corporations. Ben devised investment strategies for the Sley Corporations. On September 20, 1979, Ben bought 1,750 Krugerrands at a cost of about $700,000 for the Sley Corporations. On October 3, 1979, Ben sold the 1,750 Krugerrands at a profit of about $40,000 for the Sley Corporations. On October 4, 1979, Ben bought 38 diamonds at a cost of $2,369,190 for the Sley Corporations. On October 9, 1979, Ben bought another 1,750 Krugerrands at a cost of about $700,000 for the Sley Corporations. At some later date, Ben and petitioner traveled to New York to receive the diamonds. Each of them wore a money belt that contained more than $1 million worth of diamonds, which they carried to Washington, D.C., and then put into the Sley Corporations' safe deposit box in a Washington, D.C., bank. Ben received a Gemological Institute of America (hereinafter sometimes referred to as GIA) certificate for each diamond. A GIA certificate is a written description of a diamond's physical characteristics. At various other dates, Ben bought (in 1979 and 1980) and sold (in 1980)

Krugerrands for the Sley Corporations.  The sales produced a 1980 profit of $75,150 for the Sley Corporations.

In 1981, there was a very rapid drop in the prices of both diamonds and gold.

In 1980, Ben was employed as a stockbroker; he engaged in transactions on behalf of the Sley Corporations that year.  In 1981, Ben went back to law school full-time.  From 1981 through 1986, Ben did not perform any investment services for the Sley Corporations other than generally keeping abreast of financial markets for the Sley Corporations and for his own investment purposes, and reviewing monthly account statements from the banks at which the Sley Corporations had cash management accounts.  In 1987, Ben made some investments for Markette's pension and profit-sharing plan.

On January 20, 1984, Girard Holding Co., Inc., sold land and parking lot improvements for $640,000; it reported a $511,658 gain on this sale.  Twelfth and Sansom Corp. was liquidated in 1985.  The liquidation included about $1 million worth of assets.

Apart from the disposition of Krugerrands when Twelfth and Sansom Corp. was going through its liquidation, none of the Sley Corporations bought or disposed of any Krugerrands or diamonds between the end of 1980 and the end of 1986.  See infra table 1. In fact, the Sley Corporations still owned those same Kruggerands and diamonds during the trial of the instant cases.

Table 1 shows the investment portfolios of the Sley Corporations for 1980 through 1986.  The values shown are the historical costs of these assets.  Apart from the limited buying and selling of certificates of deposit and moving money from one bank or account to another done by petitioner, see infra, the 1984 Girard Holding Co., Inc., land and parking lot sale, and the 1985 Twelfth and Sansom Corp. liquidation, the assets held by the Sley Corporations did not change during the years in issue.  The cash management accounts shown in table 1 were accounts held at the trust department of a bank; the trust department automatically fully invested the accounts' income and principal on a daily basis.

Table 1

### Brine Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $1,556,190 | $1,533,220 | $1,957,913 | $1,984,248 | $937,270 | $817,270 | $1,627,989 |
| Diamonds | 518,001 | 518,001 | 518,001 | 518,001 | 518,001 | 518,001 | 518,001 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Marketable securities | 48,750 | 48,750 | 48,750 | 48,750 | 48,750 | 48,750 | 48,750 |
| Certificates of deposit | -- | -- | -- | -- | 1,030,822 | 1,088,863 | -- |
| Totals | $2,219,221 | $2,196,251 | $2,620,944 | $2,647,279 | $2,631,123 | $2,569,164 | $2,291,020 |

### Girard Holding Co., Inc.

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $752,260 | $745,700 | $762,823 | $815,823 | $963,819 | $855,717 | $1,245,356 |
| Diamonds | 101,269 | 101,269 | 101,269 | 101,269 | 101,269 | 101,269 | 101,269 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 1,725 | 1,725 | 1,725 | 1,625 | 1,625 | 1,625 | 200 |
| Ready assets | -- | 917 | 1,032 | 1,123 | 1,241 | 1,342 | 1,428 |
| Marketable securities | 188,703 | 188,703 | 188,703 | 188,703 | 188,703 | 188,703 | 173,603 |
| Repurchase agreement | -- | 5,000 | 5,337 | 5,796 | 6,350 | 6,805 | 7,185 |
| Certificates of deposit | -- | -- | -- | -- | 395,980 | 429,934 | |
| Totals | 1,140,137 | 1,139,494 | 1,157,069 | 1,210,519 | 1,755,167 | 1,681,575 | 1,625,221 |

### Markette Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $2,838,000 | $2,790,680 | $2,755,258 | $2,710,130 | $839,386 | $766,980 | $2,195,735 |
| Diamonds | 1,477,377 | 1,477,377 | 1,477,377 | 1,477,377 | 1,477,377 | 1,477,377 | 1,477,377 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Repurchase agreements | 19,000 | -- | -- | -- | -- | -- | -- |
| Certificates of deposit | -- | -- | -- | -- | 1,681,386 | 1,570,098 | |
| Totals | 4,430,657 | 4,364,377 | 4,328,915 | 4,283,787 | 4,094,429 | 3,910,735 | 3,769,392 |

### Chestnut Parking Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cash management acct | $50,700 | $45,000 | $45,032 | $45,032 | $45,032 | $28,032 | $27,032 |
| Diamonds | 269,745 | 269,745 | 269,745 | 269,745 | 269,745 | 269,745 | 269,745 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Totals | 416,725 | 411,025 | 411,057 | 411,057 | 411,057 | 394,057 | 393,057 |

### Locust Corporation

| Assets | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $32,260 | $22,970 | $22,974 | $22,974 | $22,974 | $20,974 | $19,774 |
| Diamonds | 252,842 | 252,842 | 252,842 | 252,842 | 252,842 | 252,842 | 252,842 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Totals | 381,382 | 372,092 | 372,096 | 372,096 | 372,096 | 370,096 | 368,896 |

### Nine Ten Chestnut Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management | $11,000 | $497,980 | $416,126 | $416,127 | $412,327 | $312,327 | $297,327 |
| Krugerrands | 13,740 | 13,740 | 13,740 | 13,740 | 13,740 | 13,740 | 13,740 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Ready assets | | 16,567 | 18,666 | 20,298 | 22,435 | 24,248 | 25,817 |
| Repurchase agreement | | 15,000 | 16,012 | 17,388 | 19,050 | 20,415 | 21,562 |
| Totals | $24,840 | 543,387 | 464,644 | 467,653 | 467,652 | 370,830 | 358,546 |

### Stephen Girard Investment Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $113,700 | $99,900 | $99,708 | $99,708 | $99,708 | $99,708 | $99,708 |
| Diamonds | 100,125 | 100,125 | 100,125 | 100,125 | 100,125 | 100,125 | 100,125 |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Totals | 310,105 | 296,305 | 296,113 | 296,113 | 296,113 | 296,113 | 296,113 |

### Twelfth and Sansom Corporation

| Asset | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| Cash management acct | $286,870 | $288,390 | $969,655 | $845,655 | $845,655 | -- | -- |
| Krugerrands | 96,180 | 96,180 | 96,180 | 96,180 | 96,180 | -- | -- |
| Affiliate | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Ready assets | -- | 821 | 925 | 1,005 | 1,111 | -- | -- |
| Repurchase agreement | -- | 15,000 | 16,012 | 17,388 | 19,050 | -- | -- |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Marketable securities | 84,500 | 84,500 | 84,500 | 84,500 | 84,500 | 84,500 | -- |
| Totals | 467,650 | 484,991 | 1,167,372 | 1,044,828 | 1,046,596 | 84,600 | 100 |

Daily Operations:  1980 Through March 1986

In the fall of 1980, after Hicks resigned, the business offices of the Sley Corporations were moved from Philadelphia to Washington, D.C., into space sublet from and adjacent to Grossman & Flask's office.  Later, when the Grossman & Flask office was moved, the Sley Corporations' office was simultaneously moved, so that the Sley Corporations' office remained in sublet office space of Grossman & Flask throughout the years in issue.  When the Sley Corporations' offices moved to Washington, D.C., petitioner took control of the daily operations of the Sley Corporations.  Betsy did not give petitioner directions as to how to run the daily operation of the Sley Corporations.

Tanja Baybrook, hereinafter sometimes referred to as Baybrook, was the bookkeeper for the Sley Corporations from September 1980 to March 1986.  She has a B.S. degree in accounting from Northeastern University.  Petitioner interviewed and hired Baybrook for this bookkeeping position.  Petitioner explained to Baybrook her duties with the Sley Corporations, and told her that she was to report to him in connection with that work.  Petitioner supervised Baybrook in carrying out her duties for the Sley Corporations.  During Baybrook's interview, petitioner told her that he was administering the Sley Corporations.  Baybrook saw Betsy and Ben in the Sley Corporations' office on a few occasions, but not on a regular basis; she saw Beatrice there only once.  Baybrook never received

instructions as to how to perform her duties from Beatrice, Betsy, or Ben. Baybrook's salary started at about $15,000 per year and increased a little over time.

In early 1981, Baybrook also began doing the bookkeeping for Grossman & Flask. Baybrook spent about 75 percent of her time doing the bookkeeping for Grossman & Flask. Baybrook was paid by Parkette; she was not paid by Grossman & Flask. Petitioner explained to Betsy that, because he was not being paid directly for his administrative work on behalf of the Sley Corporations, Parkette's payment of Baybrook's entire salary was, in effect, an indirect way of the Sley Corporations paying for his administrative work.

Pursuant to her duties for the Sley Corporations, Baybrook did bank reconciliations, disbursed payroll checks, and prepared general ledger and payroll quarterly tax returns; she also prepared checks for paying bills, and prepared summary financial statements and monthly financial statements. Baybrook created, among other documents, computerized books of accounts and bank statements for the investment accounts of Brine Corp., Girard Holding Co., Inc., and Markette. Baybrook did this work after discussing it with petitioner, and chose the computer and program after petitioner approved the purchases. Baybrook did not prepare any minutes for the Sley Corporations. Baybrook occasionally prepared corporate correspondence, which generally was signed by petitioner.

Baybrook opened the Sley Corporations' mail.  For those bills that came into the office that were readily identifiable, Baybrook prepared checks as payment; for those bills that she had questions about, she asked petitioner.  Petitioner told Baybrook which of the Sley Corporations would pay a particular bill; Baybrook used her own judgment to categorize the expenses on the Sley Corporations' books.  Baybrook prepared the checks as payment for bills that came in on a particular day, attached the bills to the checks, then took the bills and checks to petitioner so that he could review the bills and sign the checks. Petitioner closely reviewed the checks that Baybrook prepared against each underlying bill.

Petitioner usually signed the Sley Corporations checks prepared by Baybrook.  Betsy occasionally signed Sley Corporations checks.  Baybrook generally prepared about 12 Sley Corporations checks per month as payments for dividends, rent, telephone, payroll, and travel, although there was heavier activity in some months.  Petitioner signed more than 98 percent of the Sley Corporations checks that were written from January 1, 1983, thought March 31, 1986.

The invoices that came into the Sley Corporations' offices from American Express discussed <u>infra</u> (under <u>Travel and Entertainment Expenses</u>), were processed a bit differently.  These invoices were addressed primarily to petitioner at his home. Petitioner usually brought these invoices to Baybrook and told

her which of the Sley Corporations would pay for the charges on a particular invoice. If Baybrook had a question as to which of the Sley Corporations would pay for a particular charge, then Baybrook asked petitioner. Baybrook prepared the check, attached the invoice to the check, and returned the invoice with the attached check to petitioner for his final review. Petitioner closely reviewed the checks that Baybrook prepared against each invoice; he also reviewed each transaction on each invoice. Baybrook categorized these charges as "TRAVEL/TRANSPORTATION" expenses on Markette's books and records. Petitioner never told Baybrook that a travel expense was personal, as opposed to business, and thus was not to be paid by the Sley Corporations. At one time, when Baybrook was going to Orlando, Florida, for personal purposes, petitioner asked Baybrook to check on the health of two people who were receiving checks from Harry's estate. Petitioner arranged for Baybrook to be paid $200 by the Sley Corporations, which was payment for her time and the expenses she incurred while doing work for Harry's estate[5] while in Florida, not the cost of her entire trip to Florida.

Baybrook prepared Sley Corporations' payroll checks to be paid to Beatrice, Betsy, and Ben. Petitioner told Baybrook the

---

[5] Petitioner's proposed finding 318 states that this work was for Markette. Respondent did not object to this proposed finding. Nevertheless, Baybrook's detailed testimony, on which petitioner's proposed finding was based, makes it clear that the work was done for Harry's estate, and we have so found.

amount for which each payroll check should be written and later told her when the amounts of the payroll checks changed. See infra Salaries and Dividends. Baybrook was not told the reasons for the changes. When petitioner gave these instructions to Baybrook, he did not indicate to her that he was passing on instructions from the Sley Corporations' officers. Baybrook also prepared the Sley Corporations payroll tax returns; petitioner signed them. Petitioner signed Sley Corporations tax returns as an "officer"; the "title" he used was "attorney".

Baybrook prepared summary financial statements of petitioner's income based on the books she kept for the Sley Corporations and for Grossman & Flask; Baybrook did not intend that these summaries be all-inclusive, but she tried and intended to include everything that occurred "inside the office"--that is, the income from Grossman & Flask and from the Sley Corporations. Baybrook was not asked by petitioner to prepare the summary financial statements; Baybrook prepared them as a courtesy to Harvey J. Berger, hereinafter sometimes referred to as Berger, the accountant who, from 1980 on, prepared the Sley Corporations' tax returns and petitioner's and Betsy's joint tax returns. Baybrook gave the summary financial statements to petitioner so that he could make sure that all items of income and deductions were included. Baybrook was never asked to prepare a schedule of constructive dividends.

During 1983 through March 1986, when Baybrook left the Sley Corporations, Baybrook did not have any communication with either Beatrice, Betsy, or Ben about the Sley Corporations. During these years, Baybrook did not send to Beatrice, Betsy, or Ben copies of bills, the financial statements she prepared, or any other correspondence that came into the office. Baybrook did not see any correspondence that was signed or received by Beatrice, Betsy, or Ben on behalf of the Sley Corporations, except for (1) occasional checks signed by Betsy or (2) promissory notes signed by Sley Corporations officers. During this period, Baybrook was in the Sley Corporations offices virtually every day, except when she was on vacation.

Betsy did not direct either petitioner or Baybrook as to which, if any, of the Sley Corporations should pay for the expenses appearing on the American Express invoices. Petitioner checked with Betsy as to whether Betsy charged particular items or incurred particular expenses, but he did not ask Betsy whether particular expenses should be paid by the Sley Corporations. Neither Betsy nor Ben gave petitioner instructions to pass along to Baybrook as to the amount of salary Beatrice, Betsy, and Ben were to receive, nor did they give instructions as to which of the Sley Corporations were to pay the salaries.

In addition to supervising Baybrook and running the daily operations of the Sley Corporations, petitioner transferred money among the Sley Corporations' bank accounts and bought

certificates of deposit for the Sley Corporations.  For example, in July 1984, petitioner told Baybrook to telephone the Mellon Bank, where Markette had an investment account, and have $1 million transferred from the Mellon Bank to the National Permanent Bank of Washington to buy certificates of deposit.  In October 1984, petitioner told Baybrook to telephone the Mellon Bank and have that bank transfer $75,000 to Markette's checking account.

On February 3, 1986, petitioner moved the amounts shown in table 2 from the National Permanent Bank of Washington and deposited these funds into accounts he had opened in the names of the Sley Corporations at the National Bank of Washington.

Table 2

| Corporation | Amount Transferred |
| --- | --- |
| Markette | $1,663,963.84 |
| Brine Corp. | 1,171,718.68 |
| Girard Holding Co. | 433,638.66 |

On February 4, 1986, petitioner transferred by wire $432,638.66 from Girard Holding Co., Inc.'s account at the National Bank of Washington to the Mellon Bank.  On February 4 or 5, 1986, $1,170,718.68 was transferred by wire to Brine Corp.'s account at Mellon Bank and $1,654,754.92 was transferred by wire to Markette's account at Mellon Bank.  Generally, Ben was not involved in decisions to invest money in particular certificates of deposit or to move money from one bank or account to another;

however, petitioner did speak to Ben before he moved funds out of the National Permanent Bank of Washington in February 1986.

In January 1981, petitioner became the named fiduciary for the Markette Corporation Comprehensive Health Plan, which was created at that time. Petitioner was the administrator and one of the trustees of the Parkette Corporation Profit Sharing Plan and also of the Parkette Corporation Pension Plan. Both of these plans were established "as of" December 31, 1980, and both plans covered employees of all the Sley Corporations. In 1984, petitioner handled the sale of real estate that belonged to one of the Sley Corporations.

From 1980 to about March 1986, Betsy did not take an active interest in the Sley Corporations, nor did she have a working knowledge of the Sley Corporations' operations. During the years in issue until March 1986, Betsy entrusted the entire operations of the Sley Corporations to petitioner so that she could stay at home to take care of her children; Betsy also was very involved in civic activities. During the years in issue until 1986, Betsy and petitioner had, in Betsy's words, an "old-fashioned relationship" where she took care of the children and the household, and petitioner took care of business matters, those being his law practice and the daily operations of the Sley Corporations. However, see our findings as to petitioner's and Betsy's joint checking account, under Background, supra.

Before 1986, Betsy had a general understanding of what assets the Sley Corporations held, participated in general family discussions about the Sley Corporations, and "just read up on different things and the Wall Street Journal." From 1980 through about March 1986, Betsy did not go into the Sley Corporations' office, review the monthly financial statements, or sign Sley Corporations' correspondence on a regular basis. From 1979 through early 1986, Betsy merely signed whatever petitioner asked her to sign. Before 1986, Betsy did not have any involvement in the preparation, review, or filing of the Sley Corporations' tax returns.

Ben lived in Texas during the years in issue and did not take responsibility for, nor have any involvement in, the daily operations of the Sley Corporations. Ben received copies of the Sley Corporations' tax returns, but he did not have any involvement in the preparation and filing of those tax returns. In 1984, Ben was involved in decision-making that led to the liquidation of Twelfth and Sansom Corp. Also in 1984, Ben proposed consideration of liquidating all the Sley Corporations. Petitioner and Ben received a letter from Berger stating the pros and cons of liquidation; Twelfth and Sansom Corp. was the only one of the Sley Corporations that was liquidated.

In September of 1984, 1985, and 1986, Beatrice, Betsy, and Ben met as the Markette board of directors, to authorize the redemption of stock held by trusts of which Betsy and Ben were

the beneficiaries. From 1983 to 1986, these three meetings were the only meetings held of the Sley Corporations' directors. The minutes prepared for these three meetings were the only minutes prepared for the Sley Corporations for about 1982 through 1989.

During the period 1980 through 1986, petitioner and his law firm performed legal services for the Sley Corporations. When such services were performed, Grossman & Flask billed the client for fees.

Daily Operations: After March 1986

Matters between petitioner and Betsy were deteriorating. Petitioner and Betsy separated permanently in September 1986.

When Baybrook left the Sley Corporations in March 1986, Betsy began to become more involved with the operation of the Sley Corporations. Betsy began signing checks and tax returns; she interviewed and hired a bookkeeper in July 1986, Bridgette Coupeon, and a replacement for Bridgette Coupeon in September 1986, Evelyn Wilson, hereinafter sometimes referred to as Wilson.

Maggie-Jo Brown, hereinafter sometimes referred to as Brown, is an accountant who originally was employed by the accounting firm of Grant Thornton under Berger's supervision. The first week after Brown started at Grant Thornton, in February 1985, Berger assigned her to prepare the 1984 tax returns and compilation financial statements for the Sley Corporations. (For a description of the compilation financial statements, see Financial Statements, etc., infra.) After Baybrook left the Sley

Corporations, Brown began going into the Sley Corporations' office on a weekly basis, at night or on the weekend, to do work for the Sley Corporations that Baybrook had left undone; at this point, Brown was still employed by Grant Thornton. Brown did the bookkeeping, made sure that checks were written and payroll tax returns were filed, and answered correspondence.

Brown first met Betsy and Ben in April 1986. Thereafter, Brown dealt with both petitioner and Betsy regarding the Sley Corporations. Over the course of 1986, however, petitioner told Brown to start directing questions regarding the Sley Corporations to Betsy. After Wilson was hired as the Sley Corporations' bookkeeper in September 1986, Brown no longer went into the Sley Corporations' office on a weekly basis and mainly dealt with Wilson over the telephone about questions concerning the Sley Corporations when preparing the compilation financial statements and the tax returns. Although petitioner's status in the Sley Corporations' operations diminished after March 1986, he continued to play a role throughout 1986.

In January 1987, Betsy, petitioner, and Brown met with a bond investor; the purpose of the meeting was to have Betsy begin to think about the investment portfolios of the Sley Corporations, which had not changed since 1980. See supra table 1. In April 1987, Brown ended her employment with Grant Thornton. In May 1987, petitioner and Betsy hired Brown to work for the Sley Corporations as the comptroller; this position

combined the bookkeeping and the tax preparation duties.  As a practical matter, Betsy ran the Sley Corporations by the time Brown was hired, and Betsy supervised Brown.

Salaries and Dividends

Beatrice started receiving a salary from the Sley Corporations in 1978, when she and Hicks took over the operations of the Sley Corporations.  Beatrice also received dividends from the Sley Corporations.

Before 1980, Betsy and Ben received dividends, but not salaries, from the Sley Corporations.  In 1980, Betsy received a salary of $25,000.  From 1981 through 1987, Betsy and Ben each received salaries of at least $100,000.  In 1986, each of them received a salary of $124,583.  Betsy and Ben were not doing anything more for the Sley Corporations in 1981 and later years than they were doing before 1981.

Neither Betsy nor Ben set the salaries for themselves or for their mother.  Betsy does not know why she received her salary from Markette,[6] nor does she know why she received the amounts of salaries she received.  Likewise, Ben does not know why he received his salary from Brine Corp.,[7] nor does he know why he

---

[6]     Betsy received her salary exclusively from Markette, except for 1983, when she also received $1,562 from Girard Holding Co., Inc.

[7]     Ben received his salary exclusively from Brine Corp., except for 1983, when he also received $1,563 from Girard Holding Co., Inc.

(continued...)

received the amounts of salaries he received.  Beatrice, Betsy, and Ben received salaries from only one or two of the Sley Corporations, so that, as to any one shareholder or one corporation, the salaries were grossly disproportionate to the shareholdings.  However, the aggregate salaries of each of them were closely proportionate to their respective aggregate ownerships of the Sley Corporations.

Betsy and Ben learned the amounts of their Sley Corporations salaries from petitioner; they did not direct petitioner on this matter.  Petitioner set Betsy's and Ben's Sley Corporations salaries, at least up to early 1986.

Table 3 shows the amounts that Markette withheld as Social Security taxes, hereinafter sometimes referred to as F.I.C.A. taxes, from the amounts Markette paid as salary to Betsy.

Table 3

| Year | Amount |
|------|--------|
| 1983 | $2,391.91 |
| 1984 | 2,532.59 |
| 1985 | 2,791.78 |
| 1986 | 3,003.00 |
| 1987 | 3,131.70 |
| 1988 | 3,379.50 |

At the end of each year, Berger came into the Sley Corporations' office to calculate the amounts of the dividends

_____

[7](...continued)

each of the Sley Corporations had to pay out in order to avoid the personal holding company tax.

Table 4 shows the amounts of Sley Corporations dividends paid to Betsy and reported on Schedules B of petitioner's and Betsy's joint tax returns.

Table 4

| Year | Amount |
|------|--------|
| 1983 | $36,384 |
| 1984 | [1]37,609 |
| 1985 | 13,481 |
| 1986 | 18,153 |

[1] Petitioner's proposed finding 59, not objected to by respondent, shows this total as $37,573.  Our finding is the sum of the component dividend amounts, which are correctly transcribed from petitioner's and Betsy's 1984 joint tax return. The $36 difference between our finding and the total on petitioner's proposed finding does not affect our analysis.

## Travel and Entertainment Expenses[8]

[8]    On brief, in proposed finding 165, respondent asks us to find that "During the years 1893[sic] through 1986, Markette paid and deducted the following travel expenses".  The proposed finding then sets forth the amounts shown on Markette's tax returns for those years.  In compliance with Rule 151(e)(3), respondent shows exhibits Q, R, and S, retained copies of Markette's tax returns, as the sources in the record supporting the proposed finding as to what Markette deducted as travel expenses for 1983, 1984, and 1985.  As respondent properly alerts us on brief, "Exs. Q, R, and S were admitted into evidence for the limited, non-hearsay, purpose of establishing the compensation and dividends reported by the corporation." Respondent's counsel limited his offer of those exhibits at trial to the compensation and dividend information shown on those tax returns.  We overruled petitioner's objections to that limited offer.  The trial adjourned for the weekend, resumed the following Monday, and continued for an additional 496 pages of transcript.

Later that same day, respondent's counsel properly asked to expand the limited admission.  Respondent's counsel explained as
(continued...)

During the years in issue, Markette had several American Express credit card accounts on which credit cards were issued in petitioner's name and in Betsy's name.  Petitioner and Betsy

_____

8(...continued)
follows:

> I had stipulated that the nonhearsay purpose for which I was offering those returns was to prove, I believe I said, salary and dividends.  I would like to modify that to cover all compensation and dividends.

> The Revenue agent, in preparing her summary, included other things in compensation besides salary, to include particularly contributions to pension and profit sharing plans.  Those also would be nonhearsay purposes.  We don't care if they are true or not; we just want to show what was reported to the IRS.

The Court accepted the expansion.  The expansion clearly did not relate to deductions of travel expenses.

If respondent's counsel overlooked the travel expenses matter before the instant cases were submitted and later concluded that it was important to secure a further expansion, then respondent's counsel should have either (1) secured petitioner's agreement or (2) moved before opening briefs were due to reopen the record to expand the limited admission.  We do not believe it is appropriate to allow petitioner to write and file his opening brief on the assumption that these exhibits were offered and received only for a specified limited purpose and, afterward, learn that these exhibits are being used for another purpose.  True, petitioner has (and used) the opportunity to respond on answering brief.  However, if the Court were to accede to respondent's request in this situation, then petitioner would have been deprived of the opportunity to use the expanded admission in crafting his own proposed findings.

There may be extraordinary circumstances under which such a delay in presenting the matter may be excusable.  We do not decide that hypothetical; in the instant cases, we do not reach the question of what we would have ruled if respondent had presented the matter seasonably.  We shall expand the limited admission.  Exhibits Q, R, and S were admitted at trial for limited purposes and, as so limited, do not support respondent's proposed finding.

charged travel and entertainment expenses on these credit cards, as detailed infra.

Since the 1960's, Betsy has held credit cards issued in the name of one or another of the Sley Corporations.  Harry originally gave these credit cards to Betsy.  Betsy had used the credit cards, both before and during the years in issue, without regard to whether the charges made had a business purpose.  Betsy understood that, as a result, Markette would be paying for the amounts she charged, and that she and petitioner would not be paying for these amounts.  Petitioner used his Markette American Express credit card only once after 1986.

When Betsy took a trip without petitioner, she informed him of the trip.

1983

Table 5 lists certain checks written on the Markette account in 1983.  The table shows the date the check was written, check number, payee, and amount.  All of these checks were signed by petitioner.  Respondent determined that petitioner and Betsy failed to report $18,611.70 of constructive dividends received from Markette in 1983, the sum of the checks listed in table 5, $15,299.88, plus the amount of a $3,311.82 debit memorandum resulting from a transfer of funds to Media Communications, Inc.[9]

---

[9]    Respondent's travel and entertainment expense determinations in the notices of deficiency are based on amounts of certain Markette checks.  It is apparent to us that, in general, our redetermination should be based on evaluations of the specific trips or the occasions of the specific entertainment
(continued...)

Table 5

| Date 1983 | | Check Number | Payee | Amount |
|---|---|---|---|---|
| Jan. | 05 | 1824 | American Express | $42.80 |
| Feb. | 03 | 1844 | American Express | 3,588.87 |
| Mar. | 28 | 1856 | American Express | 1,038.08 |
| Apr. | 18 | 1862 | Eastern Airlines | 1,302.00 |
| May | 11[1] | 1870 | American Express | 795.59 |
| May | 24 | 1873 | American Express | 964.41 |
| June | 29 | 1884 | American Express | 2,210.00 |
| Aug. | 04 | 1896 | American Express | 3,366.19 |
| Sept. | 19 | [2]115417 | American Express | 1,001.60 |
| Sept. | 29 | 1903 | American Express | 496.00 |
| Nov. | 11[3] | 1912 | American Express | 494.34 |
| | | | | 15,299.88 |

Debit Memorandum[4]

| | | | | |
|---|---|---|---|---|
| June 02 | | -- | Media Communications | 3,311.82 |
| | Total | | | 18,611.70 |

[1]  Markette's cash disbursements journal shows the date as May 9, but the check itself is dated May 11.

[2]  Markette's cash disbursements journal shows the check No. as 115416800, but the check itself is numbered 115417; it appears to be a counter check.

---

[9](...continued)
items.  The trips often cut across the American Express vouchers and the Markette checks.  It is often difficult to determine which voucher items are to be matched with a specific trip or entertainment item, or with a specific Markette check.  These difficulties are heightened in those instances in which American Express allowed credits for amounts previously paid, but the record herein does not clearly describe the specific charge that is being reversed in whole or in part by the specific credit.  As a result, notwithstanding the extensive record and long briefs, there are many items as to which we have been unable to make meaningful findings.  The sums of these items appear infra in tables 6, 8, 10, and 12, in the columns headed "Unknown".

[3] Markette's cash disbursements journal shows the date as Nov. 10, but the check itself is dated Nov. 11.

[4] Markette's cash disbursements journal shows this item as check No. 1877, the date as June 1, and the payee as National Seminar, Inc. The bank's debit memorandum itself shows the information set forth in the table.

During the years in issue, petitioner, Betsy, and the children usually flew to Miami to see Beatrice in December and in the spring, and stayed for about one week. No notes or records were kept of any Miami Sley Corporations' business discussions. Baybrook was never asked to make copies of the Sley Corporations' financial statements to take to Miami, nor was Baybrook asked to make travel arrangements.

Check No. 1862--Miami. In February 1983, five Eastern Airlines tickets, costing $1,302, were bought for petitioner, Betsy, and the children to fly to Miami to visit Beatrice. The primary purpose of this trip was personal--a family vacation.

These tickets were paid for by Markette check No. 1862.

Check No. 1896--Lake Tahoe. The American Express July invoice includes petitioner's charges totaling $1,351.50 for five United Airlines tickets for petitioner, Betsy, and their children to fly round-trip from Washington, D.C., to Reno, Nevada. The primary purpose of this trip was personal--a family vacation to Lake Tahoe to visit relatives in the area (petitioner's father rented a condominium in Lake Tahoe) and to go skiing. These charges were paid for by Markette check No. 1896. The family usually went to Lake Tahoe in August. However, petitioner did

not go on this trip, and the $318 charge for his ticket was refunded by a credit on the American Express August invoice. Thus, the $318 that was later refunded is not properly part of the cost of this Lake Tahoe trip.

Check No. 1896, Debit Memo--Hawaii. The American Express July invoice includes charges totaling $2,014.69 for miscellaneous hotel and airline expenses on a trip to Hawaii by petitioner, Betsy, and the children. Petitioner charged all of these expenses on his Markette American Express credit card. The primary purposes of this trip were (1) for petitioner to appear as a panelist on a video conference to be broadcast from Hawaii by satellite, (2) to meet Howard Ruff (hereinafter sometimes referred to as Ruff) in person, and (3) to take a family vacation. These charges were paid for by Markette check No. 1896.

Petitioner was invited to be a panelist by a radio talk show host, H.I. "Sonny" Bloch, hereinafter sometimes referred to as Bloch. Bloch's brother, a Washington, D.C., attorney, was a client of petitioner. Bloch also became a client of petitioner. Ruff, a well-known financial adviser, described by petitioner as "the greatest guru", was the other panelist. On the video conference, Ruff spoke about financial aspects of investing, and petitioner spoke about tax aspects of investing. The video conference was a segment of "Investor's Action Line", a nationally syndicated television program for investors and

financial specialists. The video conference took place in Hawaii to accommodate Ruff's schedule. Ben was an admirer of Ruff and believed in Ruff's views. At Ben's suggestion, petitioner and Betsy went to a seminar that Ruff was conducting on Maui apart from his appearance on the video conference, and "went through the seminar to see what was going on".

Petitioner, Betsy, and the children checked into a hotel on Maui on June 7, 1983. The video conference was conducted on June 8, 1983, in Honolulu, on Oahu, and lasted about 2 hours. Honolulu is about 100 miles from Maui by air. Petitioner, Betsy, and the children checked into another hotel on Maui on June 13, 1983. Their stay in Hawaii lasted altogether 10 days or more.

The $2,014.69 of charges related to the Hawaii trip includes two items for $39.95 each. The charge on one of the $39.95 items was refunded by a credit on the American Express August invoice, and so is not properly part of the cost of the Hawaii trip.

On June 2, 1983, $3,311.82 was transferred, via debit memorandum, from Markette to Media Communications, Inc. Markette's cash disbursements journal shows a June 1, 1983, check (No. 1877) in the amount of $3,311.82 to National Seminar, Inc., the company that produced the video satellite broadcast on which petitioner appeared. The record does not include a copy of the June 1, 1983, check, nor does it enable us to determine whether the check to National Seminar, Inc., and the June 2, 1983, debit memorandum to Media Communications, Inc., are essentially the

same transaction. Likewise, the record does not enable us to determine the purpose of either the check or the debit memorandum.

There was no, or practically no, Sley Corporations business purpose for the Hawaii trip, and the predominant purposes of the Hawaii trip were personal and Grossman & Flask business.

Check Nos. 115417 and 1896--1984 Olympics. On August 12, 1983, Betsy bought $1,359.55 of tickets to the 1984 Olympics in Los Angeles, and charged this on her Markette American Express credit card. The tickets were used by petitioner, Betsy, and their children to attend the 1984 Olympics. The purpose of this trip was personal. Betsy told petitioner that she would reimburse Markette for the cost of the Olympics tickets, but she did not reimburse Markette.

Against the bill for the 1984 Olympics tickets, American Express allowed credits on account of the $318 Lake Tahoe trip ticket refund (Check No. 1896--Lake Tahoe, supra) and the $39.95 Hawaii trip ticket refund. Check No. 1896, Debit Memo--Hawaii, supra. As a result, the American Express August invoice netted to $1,001.60, which Markette paid by check No. 115417.

Check Nos. 1903, 1912--New York City. On September 29, 1983, Markette issued check No. 1903, in the amount of $496, to American Express, to pay for round-trip airline tickets to New York City. On November 11, 1983, Markette issued check No. 1912, in the amount of $494.34, to American Express, to pay for hotel,

telephone, and meal expenses in New York City.  All the charges were on Betsy's Markette American Express credit card, but petitioner signed the credit slips for the hotel, etc., expenses. The expenses were incurred for a trip by petitioner, Betsy, and the children to New York City on September 9, 1983, and back on September 11, 1983.  The purpose of this trip was for petitioner and Betsy to go to the "diamond district" in New York City to talk with diamond brokers about selling the Sley Corporations' diamonds.  Petitioner and Betsy took GIA certificates on their visits to the diamond district, but did not take the actual diamonds.  Petitioner and Betsy did not keep notes or records of their discussions with the diamond brokers, nor did they get written quotations on the value of their diamonds.

The children were ages 13, 10, and 7 at the time of this New York trip.  Petitioner and Betsy took the children to New York City because it was more convenient to take the children with them than to get a babysitter for the children in Maryland.

Petitioner's and Betsy's airline tickets cost a total of $220; the children's tickets a total of cost $276.  Petitioner, Betsy, and the children took two rooms at the Grand Hyatt New York; the cost (including taxes) of each room for the two nights was $183.70.  Telephone call charges total $7.18.  Charges for meals total $119.76.

This New York City trip was taken for Sley Corporations business purposes and was not a personal or family vacation or

sightseeing trip. However, there were no Sley Corporations business purposes for the children's presence on this trip; their presence was for Betsy's personal purposes. Of the $990.34 of expenses paid by Markette ($496 airline plus $494.34 hotel, etc.), $520 (the children's airline tickets, one of the hotel rooms, and about half the meals) is attributable to the children and the remaining $470.34 is attributable to petitioner and Betsy.

Summary.

The record does not provide an adequate basis for findings as to the purposes of the other expenditures listed supra on table 5.

Table 6 shows our allocations with respect to respondent's determinations listed supra on table 5.

Table 6

| Date 1983 | Check Number | Payee | Check Amount | Personal or Grossman & Flask | Sley Corporations Business | Unknown | Credit Generated or (Allowed) |
|---|---|---|---|---|---|---|---|
| | | | | | Purpose | | |
| Jan. 05 | 1824 | American Express | $42.80 | -- | -- | $42.80 | -- |
| Feb. 03 | 1844 | American Express | 3,588.87 | -- | -- | 3,588.87 | -- |
| Mar. 28 | 1856 | American Express | 1,038.08 | -- | -- | 1,038.08 | -- |
| Apr. 18 | 1862 | Eastern Airlines | 1,302.00 | $1,302.00 | -- | -- | -- |
| May 11 | 1870 | American Express | 795.59 | -- | -- | 795.59 | -- |
| May 24 | 1873 | American Express | 964.41 | -- | -- | 964.41 | -- |
| June 29 | 1884 | American Express | 2,210.00 | -- | -- | 2,210.00 | -- |
| Aug. 04 | 1896 | American Express (July invoice) | 3,366.19 | 3,008.24 | -- | -- | $318.00 |
| Sept.19 | 115417 | American Express (Aug. invoice) | 1,001.60 | 1,359.55 | -- | -- | 39.95 |
| Sept.29 | 1903 | American Express (Sept. invoice) | 496.00 | 276.00 | 220.00 | -- | (318.00) |
| Nov. 11 | 1912 | American Express (Oct. invoice) | 494.34 | 244.00 | 250.34 | -- | (39.95) |
| June 02 | | Debit memorandum | 3,311.82 | -- | -- | 3,311.82 | -- |
| Total for 1983 | | | 18,611.70 | 6,189.79 | 470.34 | 11,951.57 | |

1984

Table 7 lists certain checks written on the Markette account in 1984. The table shows the date the check was written, check number, payee, and amount. All of these checks, except for check Nos. 1951, 1975, and 1995, were signed by petitioner. Check No. 1951 was unsigned (but was processed and paid, anyway), check No. 1975 was signed by Betsy, and check No. 1995 does not appear in the record. Respondent determined that petitioner and Betsy omitted to report $14,894.26 of constructive dividends received from Markette in 1984, the sum of the checks listed in table 7. In the notice of deficiency, this figure was adjusted downward by $1,214 for the amount of check No. 1995 and by $138 for a travel and entertainment reimbursement. See supra note 9.

Table 7

| Date | Check Number | Payee | Amount |
|------|--------------|-------|--------|
| Jan. 09 | 1929 | American Express | $2,526.53 |
| Feb. 21 | 1946 | Eastern Airlines | 1,616.50 |
| Mar. 12 | 1951 | American Express | 800.00 |
| Mar. 13 | 1952 | American Express | 1,840.28 |
| Apr. 17 | 1966 | American Express | 930.75 |
| May 25 | 1975 | American Express | 694.20 |
| July 20 | 1987 | United Airlines | 2,057.00 |
| Aug. 02 | 1993 | American Express | 1,399.00 |
| Aug. 31 | 1995 | American Express | 1,214.00 |
| Sept.19 | 2003 | Sean Henry | 240.00 |
| Oct. 08 | 2008 | American Express | 1,576.00 |
| | | | 14,894.26 |
| Less adjustments | | | 1,352.00 |
| Total | | | [1]13,542.26 |

[1] In the notice of deficiency, respondent made a mathematical error and stated this figure as $13,452.26. Respondent, however,

used the arithmetically correct figure, $13,542.26, in calculating the total constructive dividend amount and thus used the arithmetically correct total in determining the 1984 deficiency.

Check No. 2008--Orlando.  As payment for the American Express September invoice, Markette issued check No. 2008,[10] for $1,576, to American Express on October 8, 1984.  By this check, Markette paid for five Eastern Airlines tickets appearing on the August invoice and a Pan American World Airways ticket appearing on the September invoice.

The Markette American Express invoice with a closing date of October 17, 1984, shows charges for five Eastern Airlines tickets, costing $780, and no other charged items.  The October invoice also shows the $1,576 payment made with check No. 2008 and a $860 credit on account of the return or cancellation of five Eastern Airlines tickets that had appeared on the August invoice.  The October invoice charges were on Betsy's card.  The October invoice had a credit balance of $80, the net of the $780 charges and the $860 credit.

The five Eastern Airlines tickets on the October invoice were bought for petitioner, Betsy, and the children to fly from Washington, D.C., to Orlando, Florida, on September 27, 1984, and back on September 30, 1984.  The purpose of this trip was

_____

[10]    The notice of deficiency shows this as check No. 2007. However, it is clear from the context that 2008 is intended.

personal--a family vacation to meet Ben and to take the children to Walt Disney World.

No payment was made on the October invoice. The five Eastern Airlines tickets to Orlando on the October invoice were "paid for" with the $860 credit issued on account of the refund of the five Eastern Airlines tickets appearing on the August invoice. Markette had paid for the five Eastern Airlines tickets on the August invoice, later refunded, with check No. 2008. Thus, in effect, Markette used check No. 2008 to pay $780 for the five Eastern Airlines tickets to Orlando on the October invoice.

Check No. 1995. As payment for the August invoice, Markette issued check No. 1995, for $1,214, to American Express on August 31, 1984. Check No. 1995 was voided on September 10, 1984.

Summary.

The record does not provide an adequate basis for findings as to the purposes of the other expenditures listed on table 7, supra.

Table 8 shows our allocations with respect to respondent's determinations listed on table 7, supra.

Table 8

| Date 1984 | Check Number | Payee | Check Amount | Personal or Grossman & Flask | Sley Corporations Business or Voided | Unknown |
|---|---|---|---|---|---|---|
| Jan. 09 | 1929 | American Express | $2,526.53 | -- | -- | $2,526.53 |
| Feb. 21 | 1946 | Eastern Airlines | 1,616.50 | -- | -- | 1,616.50 |
| Mar. 12 | 1951 | American Express | 800.00 | -- | -- | 800.00 |
| Mar. 13 | 1952 | American Express | 1,840.28 | -- | -- | 1,840.28 |
| Apr. 17 | 1966 | American Express | 930.75 | -- | -- | 930.75 |
| May 25 | 1975 | American Express | 694.20 | -- | -- | 694.20 |
| July 20 | 1987 | United Airlines | 2,057.00 | -- | -- | 2,057.00 |
| Aug. 02 | 1993 | American Express (July invoice) | 1,399.00 | -- | -- | 1,399.00 |
| Aug. 31 | 1995 | American Express (Aug. invoice) | 1,214.00 | -- | $1,214.00 | -- |
| Sept. 19 | 2003 | Sean Henry | 240.00 | -- | -- | 240.00 |
| Oct. 08 | 2008 | American Express (Sept. invoice) | 1,576.00 | -- | -- | 796.00 |
| | | American Express (Oct. invoice) | -- | $780.00 | -- | -- |
| Less adjustments | | | (1,352.00) | | (1,214.00) | (138.00) |
| Total for 1984 | | | 13,542.26 | 780.00 | -- | 12,762.26 |

1985

Table 9 lists certain checks written on the Markette account in 1985. The table shows the date the check was written, check number, payee, and amount. Betsy signed the checks numbered 2036, 2050, 2078, and 2092. All of the other checks were signed by petitioner. Respondent determined that petitioner and Betsy omitted to report $23,014.34 of constructive dividends received from Markette in 1985, the sum of the checks listed in table 9. See supra note 9.

Table 9

| Date | Check Number | Payee | Amount |
|------|--------------|-------|--------|
| Jan. 06 | 2036 | American Express | $1,802.00 |
| Feb. 04 | 2043 | Eastern Airlines | 1,192.00 |
| Feb. 26 | 2050 | American Express | 2,002.25 |
| Feb. 26 | 2051 | Eastern Airlines | 974.00 |
| Apr. 03 | 2068 | American Express | 2,636.42 |
| May 15 | 2078 | American Express | 3,514.96 |
| May 24 | 2080 | American Express | 208.00 |
| June 06 | 2084 | American Express | 3,494.66 |
| July 10 | 2092 | American Express | 292.18 |
| Aug. 02 | 2098 | American Express | 2,587.86 |
| Aug. 27 | 2100 | American Express | 457.00 |
| Oct. 28 | 2108 | American Express | 3,530.01 |
| Nov. 25 | 2118 | American Express | 45.00 |
| Dec. 03 | 2123 | American Express | 278.00 |
| Total | | | 23,014.34 |

Check No. 2036--Miami--Betsy. The American Express December 1984 invoice includes a $198 charge for an Eastern Airlines ticket for Betsy to fly round-trip to Miami. Betsy bought the ticket in November 1984. She left Washington, D.C., on November

15, 1984, and returned on November 21, 1984. The primary purpose
of the trip was personal--to see Beatrice. This charge was paid
for by Markette check No. 2036.

Check No. 2036--Miami--Children. The American Express
December 1984 invoice includes charges totaling $397 for three
Eastern Airlines one-way tickets for the children from New York
City to Miami. Betsy bought the tickets on December 3, 1984.
The children left New York on December 26, 1984.[11] Petitioner,
Betsy, and the children had gone to New York City for Christmas.
It was intended that all five of them would go to Miami to meet
with Beatrice--a personal family vacation purpose. However,
petitioner had some business to do in Washington, D.C., before
the end of the year, so he and Betsy returned to Washington,
D.C., from New York City, while the children went directly from
New York City to Miami. A few days later, petitioner and Betsy
went on to Miami to meet Beatrice. These charges for the
children's three tickets were paid for by Markette check No.
2036.

------

[11] Petitioner's proposed finding of fact 507 indicates
that this trip was on Dec. 26, 1987, and on answering brief
respondent does not dispute the date. Even if we were to regard
the parties' agreement on this point as a supplemental
stipulation, we would disregard the stipulation because it is
contrary to the persuasive evidence in the record that the trip
was on Dec. 26, 1984. Jasionowski v. Commissioner, 66 T.C. 312,
318 (1976).

Check Nos. 2084 and 2092--Acapulco.  In April 1985, petitioner, Betsy, and the children went to Acapulco, Mexico. Petitioner and Betsy charged the following items, totaling $3,682.21, for this trip on Markette credit cards:  $2,988.46 (Acapulco Princess)--petitioner signing the charge slip made on his card, $426.21 (Viajes Mexicanos de Acapulco) and $187.55 (Aeronaves de Mexico)--Betsy signing the charge slip made on her card, and $79.99 (Andersons)--petitioner signing the charge slip made on Betsy's card.  The purpose of this trip was personal--a family spring vacation, and not to conduct Sley Corporations business.  The first, second, and fourth items, totaling $3,494.66, appear on the American Express May invoice, and were paid for by Marquette check No. 2084.  The third item, $187.55, appears on the American Express June invoice, and was paid for by Marquette check No. 2092.

Check Nos. 2092 and 2098--Stamford.  The American Express June invoice includes a $59.63[12] charge at LePavillon, in Stamford, Connecticut.  Petitioner charged this item on his American Express credit card on June 8, 1985.  Petitioner and Betsy went to Stamford from New York to attend a bar mitzvah--a personal purpose--and not on Sley Corporations' business.  This charge was paid for by Markette check No. 2092.

---

[12]    The charge slip shows $59.93, but the American Express invoice shows only $59.63, so Markette paid only $59.63.

The American Express July invoice includes charges totaling $290 for two adult ($65 ea.) and four children's ($40 ea.) one-way Eastern Airline tickets between Washington, D.C., and New York City, for travel on June 8, 1985.  The tickets, which do not indicate the direction of the flight, were charged on Betsy's American Express credit card.  These transportation expenses were incurred in connection with the same trip on which petitioner and Betsy went to Stamford for a bar mitzvah.  These charges were paid for by Markette check No. 2098.

Check No. 2092--American Express Fee.  The American Express June invoice includes a charge of $45 for the annual membership fee for petitioner's American Express credit card.  This business expense was paid for by Markette check No. 2092.

Check No. 2098--Corpus Christi.  The American Express July invoice includes charges totaling $1,137.50 for four American Airlines tickets for Betsy and the children to fly round-trip from Washington, D.C., to Corpus Christi, Texas.  The charges were made on Betsy's American Express credit card on June 24, 1985.  This trip was for personal purposes, for Betsy to visit with her mother and brother, and for the children to visit with their grandmother and uncle.  Petitioner did not go on this trip. The record does not enable us to determine how long Betsy and the children stayed in Corpus Christi.  These charges were paid for by Markette check No. 2098.

Check No. 2098--San Diego.  The American Express July invoice includes a $450 charge for an American Airlines ticket for Betsy to fly round-trip from Washington, D.C., to San Diego, California.  The purpose of this trip was personal, and not for Sley Corporations' business.  The charge was made on Betsy's American Express credit card on July 7, 1985, and was paid for by Markette check No. 2098.

Check Nos. 2098 and 2108--Canada.  On July 15, 1985, five USAir tickets were bought for petitioner and Betsy to fly from Washington, D.C., to Buffalo, New York, and the children to fly from Washington, D.C., to Buffalo, and from Buffalo to Natchez, Mississippi, in August 1985.  In August 1985, petitioner, Betsy, and the children rented an automobile in Buffalo, and incurred expenses at hotels in Montreal, Toronto, and Ottawa.  The trip in Canada lasted about 10 days.  The purpose of this trip was personal--to take a 10-day family vacation trip to Canada, and not for Sley Corporations business.  The record does not provide a basis for findings as to why (or even whether) the children went to Natchez.  The airline tickets, which total $710.36, were charged on Betsy's Markette American Express credit card, and were paid for by Markette check No. 2098.  The automobile rental and hotel expenses, which total $2,900.01, were charged on petitioner's Markette American Express credit card, and were paid for by Markette check No. 2108.

Check No. 2100--Los Angeles.  The American Express August invoice includes a $457 charge for a one-way American Airlines ticket from Los Angeles to Washington, D.C.  Petitioner bought this ticket on or about July 28, 1985, and charged it on his American Express credit card.  This charge was paid for on August 27, 1985, by Markette check No. 2100.

Check No. 2108--Lake Tahoe.  The American Express September invoice includes charges totaling $630 for Continental Airlines ticket, between Reno, Nevada, and Washington, D.C.  On August 6, 1985, Betsy bought a ticket for herself to fly round-trip from Washington, D.C.  The next day Betsy bought a one-way ticket for petitioner from Reno to Washington, D.C.  Betsy flew to Reno on August 7, 1985; Betsy and petitioner flew back 4 days later.  The primary purpose of this trip was personal--a vacation to visit petitioner's relatives' condominium in the Lake Tahoe area.  The charges were paid for by Markette check No. 2108.

Check No. 2118--American Express Fee.  The American Express November invoice includes a charge of $45 as the annual membership fee for Betsy's American Express credit card.  This business expense was paid for by Markette check No. 2118.

Summary.

The record does not provide an adequate basis for findings as to the purposes of the other expenditures listed on table 9, supra.

Table 10 shows our allocations with respect to respondent's determinations listed <u>supra</u> on table 9.

Table 10

| Date 1985 | Check Number | Payee | Check Amount | Purpose Personal or Grossman & Flask | Sley Corporations Business | Unknown |
|---|---|---|---|---|---|---|
| Jan. 06 | 2036 | American Express (Dec. invoice) | $1,802.00 | $595.00 | -- | $1,207.00 |
| Feb. 04 | 2043 | Eastern Airlines | 1,192.00 | -- | -- | 1,192.00 |
| Feb. 26 | 2050 | American Express (Feb. invoice) | 2,002.25 | -- | -- | 2,002.25 |
| Feb. 26 | 2051 | Eastern Airlines | 974.00 | -- | -- | 974.00 |
| Apr. 03 | 2068 | American Express | 2,636.42 | -- | -- | 2,636.42 |
| May 15 | 2078 | American Express (Apr. invoice) | 3,514.96 | -- | -- | 3,514.96 |
| May 24 | 2080 | American Express | 208.00 | -- | -- | 208.00 |
| June 06 | 2084 | American Express (May invoice) | 3,494.66 | 3,494.66 | -- | -- |
| July 10 | 2092 | American Express (June invoice) | 292.18 | 247.18 | 45.00 | -- |
| Aug. 02 | 2098 | American Express (July invoice) | 2,587.86 | 2,297.86 | -- | 290.00 |
| Aug. 27 | 2100 | American Express (Aug. invoice) | 457.00 | -- | -- | 457.00 |
| Oct. 28 | 2108 | American Express (Sept. invoice) | 3,530.01 | 3,530.01 | -- | -- |
| Nov. 25 | 2118 | American Express (Nov. invoice) | 45.00 | -- | 45.00 | -- |
| Dec. 03 | 2123 | American Express | 278.00 | -- | -- | 278.00 |
| Total for 1985 | | | 23,014.34 | 10,164.71 | 90.00 | 12,759.63 |

1986

Table 11 lists certain checks written on the Markette account in 1986.  The table shows the date the check was written, check number, payee, and amount.  Check Nos. 2137, 2148, and 2203 were signed by petitioner.  The remaining checks were signed by Betsy.  Respondent determined that petitioner and Betsy failed to report $12,447.69 of constructive dividends received from Markette in 1986, the sum of the checks listed in table 11.  In the notice of deficiency, this figure was adjusted downward by $788.07 for net constructive dividends of $11,659.62.[13]  See supra note 9.

Table 11

| Date | Check Number | Payee | Amount |
|------|--------------|-------|--------|
| Jan. 23 | 2137 | American Express | [1]$5,076.65 |
| Mar. 13 | 2148 | American Express | [1]1,447.00 |
| Mar. 31 | 2203 | American Express | 958.18 |
| May  10 | 2162 | American Express | [1]1,656.33 |
| Sept.30 | 2200 | American Express | 86.42 |
| Oct. 31 | 2213 | American Express | 39.00 |
| Dec. 05 | 2220 | American Express | [1]1,017.50 |
| Dec. 31 | 2227 | VISA | 2,166.61 |
| | | | 12,447.69 |

--------

[13]    The only explanation that respondent gives in the notice of deficiency for this $788.07 negative adjustment is the cryptic "Less JE[JB?] 284 11/30/86".  We have not found any explanation in the record for this negative adjustment.  Under the circumstances, we shall subtract the $788.07 from whatever amount we otherwise find to be the total 1986 constructive dividends to Betsy on account of Markette payments of Betsy's, or her household's, personal expenses.  This subtraction is to be applied in calculating income omissions resulting from fraud, as well as total income omissions.

<table>
<tr><td>Less adjustment</td><td>(<u>788.07</u>)</td></tr>
<tr><td>Total</td><td><u>11,659.62</u></td></tr>
</table>

[1]  The total amounts for check Nos. 2137, 2162, and 2220 are $6,750.65, $4,713.94, and $1,615.50, respectively.  The check amounts listed in table 11 are the net amounts respondent determined were constructed dividends.

    <u>Check Nos. 2137, 2148, and 2203--Miami</u>.  Petitioner or his family traveled to Miami in late November 1985, in January 1986, and in February 1986.  Of the net $5,424.86 expenses for these three trips charged on Markette American Express credit cards, $4,265.28 was paid for by Markette check No. 2137,[14] $438 was paid for by Markette check No. 2148,[15] and $721.58 was paid for by Markette check No. 2203.

    On November 14, 1985, Betsy bought six round-trip Eastern Airlines tickets to Miami, to leave Washington, D.C., on November 27 and return on December 1.  Three of the tickets cost $399 each

---

[14]    In the notice of deficiency, respondent allowed as Sley Corporations business expenses $1,674 of the expenses paid for by Markette check No. 2137.  At trial, respondent's revenue agent testified that the allowed $1,674 "related to November `85, January `86 and February `86 airfare to Miami."  Neither side has offered, and we have been unable to discover, a likely identification of which are the items of the total $4,265.28 Miami expenses paid by check No. 2137 that respondent determined to be includable in petitioner's and Betsy's income, and which are the items in the $1,674 not so includable.

[15]    For some reason undisclosed by the record, Markette check No. 2137 was not used to pay the charges shown on one of the four pages of the American Express Jan. 1986 invoice.  Instead, the two $219 Eastern Airlines charges on that page were paid together with American Express Feb. 1986 invoice items by Markette check No. 2148.  See <u>infra</u> <u>Check No. 2148--Betsy's Western Trip</u>.

and the other three cost $219 each. The tickets were for petitioner, Betsy, the children, and another adult, probably Beatrice. All six of these tickets, totaling $1,854, were charged on Betsy's Markette American Express credit card. Eastern Airlines refunded $200, which was credited on the December statement. On the same Miami trip, petitioner charged $179.24 at Pershing Auto Leasing in Miami Beach.

On November 26, 1985, a purchase was made of a Pan American World Airlines round-trip ticket from Dulles Airport to Miami and back to Washington, D.C. The ticket was bought for petitioner but was charged on Betsy's Markette American Express credit card; the price was $1,095. The record does not indicate which of the Miami trips this item relates to.

On or about January 6, 1986, petitioner, Betsy, and the children were in Miami. They stayed at the Omni International Hilton. Petitioner charged the $719.04 hotel bill on his Markette American Express credit card.

On December 19, 1985, Betsy bought five round-trip Eastern Airlines tickets to Miami, to leave Washington, D.C., on February 14, 1986, and return on February 17, 1986. Two of the tickets cost $399 each and the other three cost $219 each. The tickets were for petitioner, Betsy, and the children. All five of these tickets, totaling $1,455, were charged on Betsy's Markette American Express credit card. On January 24, 1986, Betsy bought a round-trip United Airlines ticket for herself from Washington,

D.C., to Miami, to Tucson, Arizona, then San Diego, California, to Denver, Colorado, and back to Washington, D.C. This is discussed further infra, at Check No. 2148--Betsy's Western Trip. It had been intended that Betsy would fly from Denver to Washington, D.C., where she would join petitioner and the children on the February 14 trip to Miami. However, petitioner's mother died in Miami at that time. What had been planned as a Presidents Day weekend visit to Miami was turned into a funeral trip to Miami. Instead of returning to Washington, D.C., Betsy bought a United Airlines one-way ticket from Denver to Miami for herself. Betsy charged the $399 cost of this ticket on her Markette American Express credit card. On or about February 15, 1986, petitioner charged the $322.58 Miami Omni International Hilton hotel bill on Betsy's Markette American Express credit card.

The $399 Denver-Miami ticket and the $322.58 Miami Hotel item appeared on the American Express March invoice. The $721.58 total of these expenses was paid for by Markette check No. 2203. The remaining above-described expenses for these Miami trips were paid for as indicated in the text supra at notes 14 and 15. However, Betsy did not use her $399 ticket that had been bought on December 19, 1985--the one that had been replaced by the Denver-Miami ticket. Markette received a credit for that ticket on the American Express April invoice. Accordingly, that $399 is not properly an expense of the Miami trips paid for by check Nos.

2137, 2148, and 2203, but rather is properly attributable to one of the trips paid for by check No. 2162. Thus, the net Miami trip expenses paid for by check No. 2137 are $4,265.28.

The primary purpose of Betsy's Denver-Miami trip ($399) and the Miami mid-February hotel stay ($322.58) was personal. The primary purpose of $1,674 of the Miami trips' expenses that appeared on the American Express December 1985 and January 1986 invoices was Sley Corporations business (see supra note 14). The $438 paid for by check No. 2148 was not included in the $1,674 Sley Corporations business expenses. The primary purpose of the remaining $2,591.28 of these expenses paid for by check No. 2137 was personal.

Check No. 2137--Snowmass. The American Express December 1985 invoice includes charges totaling $1,693.22 for four round-trip United Airlines tickets to Aspen, Colorado. The ticket for Betsy cost $521 and the other three tickets cost $390.74 each. Betsy bought the tickets on November 19, 1985. The American Express January 1986 invoice includes a $326.15 charge for a stay at the Silvertree Motel at Snowmass Village, Colorado. The $2,019.37 total of these Snowmass expense charges were paid for by Markette check No. 2137. The purpose of this trip was to take a Christmas vacation to Snowmass, a ski resort near Aspen, Colorado. Although petitioner did not go on this trip, he knew that Betsy and the children were going to Snowmass.

Petitioner, Betsy, and the children had gone to Snowmass in 1983. Betsy may have paid for the 1983 transportation by charging it on her Markette American Express credit card, but neither Betsy nor petitioner charged any of the other expenses of that trip on their Markette American Express credit cards.

Check No. 2137--Shoreham. The American Express December 1985 invoice includes a $67 charge for petitioner's and Betsy's dinner at the Shoreham Hotel in Washington, D.C. Petitioner made this charge on his Markette American Express credit card on December 7, 1985. This meal expense was paid for by Markette check No. 2137. The primary purpose of this "night out" was personal.

Check No. 2148--Betsy's Western Trip. As we found, supra (Check Nos. 2137, 2148, and 2203--Miami), on January 24, 1986, Betsy bought a round-trip United Airlines ticket for herself from Washington, D.C., to Miami, to Tucson, then San Diego, to Denver, and back to Washington, D.C. The Tucson-San Diego leg of the trip required a separate ticket on Pacific Southwest Airlines. The former ticket cost $945 and the latter ticket cost $64; both were charged on Betsy's Markette American Express credit card. Both tickets appeared on the American Express January invoice. The $1,009 total of these western trip expenses was paid for by Markette check No. 2148. This was a personal vacation trip for Betsy.

Check No. 2203--Miscellaneous.  The American Express March invoice includes charges of $53.60[16] for Lenny's Restaurant, $173 for Vista International Hotel (Washington, D.C.), and $10 for delinquency.  Petitioner charged the Lenny's item on March 3, 1986, and the Vista item on March 6, 1986.  These items, totaling $236.60, were paid for by Markette check No. 2203.

The record does not provide an adequate basis for findings as to the purposes of these expenses.

Check No. 2162--Miami, Key West, Daughters.  The American Express April invoice includes charges totaling $1,016.50 for four round-trip Eastern Airlines tickets to Miami, to leave Washington, D.C., on March 27, 1986, and return on April 5, 1986.  One of the tickets cost $362.50, and the other three cost $218 each.  The tickets were for Betsy and the children.  Betsy charged the tickets on March 12, 1986.  The American Express April invoice also includes charges totaling $231 for three round-trip Piedmont Airlines tickets to Key West, Florida, to leave Miami on April 1, 1986, and return the next day.  Each ticket cost $77.  The tickets were for Betsy and the daughters.  Betsy charged the tickets on April 1, 1986.  The $1,247.50 total

---

[16]    The charge slip shows a charge of $46.22 and a tip of $6.78, for a total of $53.00.  However, the invoice shows the amount as $53.60, and the entire invoiced amount was paid.

of these Miami-Key West expenses was paid for by Markette check No. 2162.[17]

The purpose of this trip was for Betsy and the children to take a personal vacation to Miami during the spring school break. The side trip to Key West was to see Halley's Comet. The son was sick, and so he stayed in Miami while the others went to Key West.

Check No. 2162--Miami, Key West, Son. The American Express April invoice includes charges totaling $827 for three round-trip Eastern Airlines tickets to Miami, to leave Washington, D.C., on April 11, 1986. The tickets, for petitioner, Betsy, and the son, cost $289, $319, and $219, respectively. The American Express April invoice also includes charges totaling $352 for three one-

_____

[17] As shown supra table 14, respondent determined that a net of $1,656.33 ($4,713.94 less $3,057.61) of check No. 2162 was a constructive dividend. The remaining amount, $3,057.61, represents $897 of travel expenses and $2,160.61 in connection with a computer; respondent later concluded that the computer was not paid for by check No. 2162. Respondent has not identified which travel expenses are included in the $897 that was allowed. Also, respondent has not asked for an increased deficiency, or otherwise acted, with regard to the $2,160.61 computer expense that was allowed.

As we noted in the next-to-last paragraph of supra Check Nos. 2137, 2148, and 2203--Miami, Markette received a $399 credit on its American Express April invoice. Markette used this credit to pay charges appearing on this invoice, and paid the balance by its check No. 2162. See infra table 12. For purposes of determining whether Markette paid for an item, and whether that payment constitutes a constructive dividend, it does not make any difference whether Markette's payment was accomplished by applying the credit or by check No. 2162. For convenience in our findings we shall refer to all the payments of April invoice items as being accomplished by check No. 2162.

way Piedmont Airlines tickets from Miami to Key West for April 11, 1986, and another three tickets from Key West to Miami for April 13, 1986. Each adult ticket cost $66 and each child ticket cost $44. Betsy charged all nine of these tickets on April 11, 1986. The American Express April invoice also includes a $790.23 charge for a stay at the Marriott Casa Marina at Key West. Petitioner charged this item on or about April 11, 1986. The $1,969.23 total of these Miami-Key West expenses was paid for by Markette check No. 2162.

There was a two-fold purpose for the trip: (1) To take the son to Key West to see Halley's Comet for his birthday, this to make up for his inability to see Halley's Comet with his sisters because he was sick when his sisters went; and (2) for petitioner to meet with a Grossman & Flask client.

Check No. 2162--Corpus Christi. The American Express April invoice includes charges totaling $983.78 for four American Airlines tickets to Corpus Christi, Texas. Betsy charged these tickets on March 31, 1986. These expenses were paid for by Markette check No. 2162. The purpose of this trip to Corpus Christi was personal--to visit Ben and to attend a wedding.

Check No. 2162--Philadelphia. The American Express April invoice includes a $115.22 charge for a bill from the Franklin Plaza Hotel, in Philadelphia. Petitioner charged this item on or about March 7, 1986. This item was paid for by Markette check No. 2162. The charge from the Franklin Plaza Hilton was incurred

in connection with a trip petitioner took to Philadelphia to do Pennsylvania State tax work for one of the Sley Corporations.

Check No. 2162--Miscellaneous Washington, D.C.  Miscellaneous hotel, airlines, restaurant, and theater expenses, totaling $797.21, appear on the American Express April invoice. These expenses were incurred by petitioner and Betsy in the Washington area.  These expenses were paid for by check No. 2162. The record does not provide an adequate basis for findings as to the purposes of these expenses.

Check No. 2220--Miami.  The American Express November invoice includes charges totaling $1,570.50 for six round-trip Eastern Airlines tickets to Miami.  Three of the tickets cost $299 each, and the other three cost $224.50 each.  The tickets were for Betsy, the children, probably petitioner, and another adult.  Betsy charged the tickets on October 10, 1986.  These tickets were paid for by Markette check No. 2220.  Respondent conceded that two of the adult tickets ($598) were for business purposes and reflected this concession in the notice of deficiency.  The remaining expenses were for personal purposes--a family vacation.

Check No. 2220--American Express Fee.  The American Express November invoice includes a charge of $45 as the annual membership fee for Betsy's American Express credit card.  This business expense was paid for by Markette check No. 2220.

Summary.

The record does not provide an adequate basis for findings as to the purposes of the other expenditures listed supra on table 11.

Table 12 shows our allocations with respect to respondent's determinations listed supra on table 11.

Table 12

| Date 1986 | Check Number | Payee | Check Amount | Purpose Personal or Grossman & Flask | Sley Corporations Business | Unknown | Credit Generated or (Allowed) |
|---|---|---|---|---|---|---|---|
| Jan. 23 | 2137 | American Express (Dec. invoice) | $6,750.65 | $3,593.46 | -- | -- | -- |
| | | American Express (Jan. invoice) | -- | 2,758.19 | -- | -- | $399.00 |
| less adjustments | | | (1,674.00) | (1,674.00) | | | |
| Mar. 13 | 2148 | American Express (Jan. invoice) | 1,447.00 | 438.00 | -- | -- | -- |
| | | American Express (Feb. invoice) | | 1,009.00 | -- | -- | -- |
| Mar. 31 | 2203 | American Express (Mar. invoice) | 958.18 | 721.58 | -- | $236.60 | -- |
| May 10 | 2162 | American Express (Apr. invoice) | 4,713.94 | 4,200.51 | $115.22 | 797.21 | (399.00) |
| less adjustments | | | (3,057.61) | (3,057.61) | | | |
| Sept. 30 | 2200 | American Express (Sept. invoice) | 86.42 | -- | -- | 86.42 | -- |
| Oct. 31 | 2213 | American Express (Oct. invoice) | 39.00 | -- | -- | 39.00 | -- |
| Dec. 05 | 2220 | American Express (Nov. invoice) | 1,615.50 | 1,570.50 | 45.00 | -- | -- |
| less adjustments | | | (598.00) | (598.00) | | | |
| Dec. 31 | 2227 | VISA | 2,166.61 | -- | -- | 2,166.61 | -- |
| | | | 12,447.69 | 8,961.63 | -- | -- | -- |
| less adjustment | | | (788.07) | (788.07) | | | |
| Total for 1986 | | | 11,659.62 | 8,173.56 | 160.22 | 3,325.84 | -- |

Financial Statements, Tax Returns, Audits, Notices of Deficiency

Berger is a Certified Public Account and a partner in the accounting firm of Grant Thornton;[18] he also has a J.D. degree from the University of Maryland School of Law. Petitioner approached Berger to prepare tax returns for the Sley Corporations for 1980. Berger continued to prepare or supervise the preparation of such tax returns for the years through 1986. Berger also prepared or supervised the preparation of compilation financial statements and made or supervised the making of dividend calculations to avoid the personal holding company tax for the Sley Corporations. Berger prepared or supervised the preparation of petitioner's and Betsy's joint tax returns for 1980 through 1987, and petitioner's individual tax returns for 1988 through 1991. During the years in issue, Berger or those he supervised came into the Sley Corporations' offices in February to prepare the corporate tax returns and the compilation financial statements, and in November or December to calculate the dividends needed to avoid the personal holding company tax.

---

[18] When Berger was first engaged to prepare tax returns for petitioner and Betsy, and for the Sley Corporations, he was with the accounting firm of Fox and Co. In 1985, Fox and Co. merged with Alexander Grant, and was known under the latter name for about 1 year. Thereafter, Berger's accounting firm was known as Grant Thornton.

Berger prepared the Sley Corporations' tax returns based on the books and records of the Sley Corporations, primarily the general ledger and the trial balances.[19]  Berger did not routinely verify the general ledger and the trial balances against supporting documents before preparing the corporate tax returns; Berger's firm was not retained to do any audit work on behalf of the Sley Corporations.  Baybrook was Berger's principal contact at the Sley Corporations and the person who provided Berger with information; petitioner was the secondary contact person.  Berger did not have any business discussion with Betsy about the Sley Corporations until late 1986.  Berger had access to all of the Sley Corporations' books and records that he asked for.

Berger did not give Baybrook instructions about how to report transactions or how to define expenses for the Sley Corporations.

Berger was aware that Beatrice, Betsy, and Ben were receiving six-figure salaries from the Sley Corporations; Berger did not know how the salary structure was established, who established the salary structure, or what Beatrice, Betsy, and

---

[19]    A trial balance is a listing of all account balances. It provides a means of testing whether total debits equal total credits for all accounts.  Generally, trial balances are used to prepare financial statements.  Skousen et al, Financial Accounting 62, 758 (4th ed. 1991).

Ben were doing for the Sley Corporations to earn the salaries that they were paid. Berger did not set the salary structure, nor did he participate in the setting of salary levels at any time. Berger also did not participate in the decision to allocate the officers' salaries among the Sley Corporations or among the officers themselves. Berger did not have anything to do with the decisions to raise and lower the salaries from year to year.

Berger or those he supervised prepared annual compilation financial statements for the Sley Corporations for 1980 through 1986. These compilation financial statements were a form of financial statement whereby the accounting firm takes the least responsibility for the figures. Berger and those he supervised took the Sley Corporations' figures and basically put them into financial statement format. There was no routine verification of the Sley Corporations' figures in the process of preparing compilation financial statements.

Each compilation financial statement for those years has two parts, the accountants' compilation report and the financial statements. Each accountants' compilation report for those years includes the following paragraphs:

> A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying [December 31, 1980, 1981, etc.] financial

statements and[,] accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the disclosures and the statements of changes in financial position required by generally accepted accounting principles.  If the omitted disclosures and statement[s] of changes in financial position were included in the financial statements, they might influence the user's conclusions about the company's [Corporations'] financial position, results of operations and changes in financial position. Accordingly, these financial statements are not designed for those who are not informed about such matters.

Attached to each of these accountants' compilation reports are financial statements for each of the Sley Corporations.  The financial statements for each corporation include a balance sheet listing that corporation's assets and liabilities and stockholders' equity, and a statement of income and retained earnings.  Each page of each financial statement refers the reader to the accountants' compilation report.  The figures used in the compilation financial statements came from the books and records of the Sley Corporations; the compilation financial statements were prepared at the end of each year, as soon as the books were closed.

In conjunction with the preparation of the compilation financial statements for 1981 through 1984, Berger and those he supervised used a financial statement compilation program, which is a checklist of steps to be followed in preparing a compilation financial statement.  The introductory paragraphs on the financial statement compilation program are as follows:

Our OBJECTIVE for compilation engagements is to present in the form of financial statements information that is the representation of management.  No assurances may be given.

INSTRUCTIONS:  This form specifies the procedures necessary to comply with [the accounting firm's] standards when engaged to compile financial statements of nonpublic entities in accordance with Statements on Standards for Accounting and Review Services (SSARS).  Form PF-06 is also required documentation for compilation engagements.

We are not required by SSARS to make inquiries or perform procedures to corroborate or review information supplied by the client.  Any information we may have indicating that client-supplied data is incorrect, incomplete or unsatisfactory must be addressed by us and resolved regardless of the source of such data.  [Emphasis in originals.]

Berger prepared or supervised the preparation of compilations of financial statements as checklists in preparing the compilation financial statements for 1985 and 1986.  The introductory language of the compilations of financial statements states the following as the compilation objectives:

A. To assist the client in presenting its financial data in financial statement form.  B. Determine that professional standards for compilation engagements have been met and that any significant matters that came to our attention have been adequately considered and resolved.

Baybrook and petitioner were the contact personnel for the Sley Corporations on the financial statement compilation programs for 1981 through 1984, and on the compilation of financial statements for 1985.  Betsy and Wilson were the contact personnel for the Sley Corporations on the compilation of financial statements for 1986.

Berger also calculated the amount of dividends to be paid out by the Sley Corporations at the end of the year so as to avoid the personal holding company tax. The amount of the dividends was dictated by the amount of the taxable income of the Sley Corporations--if taxable income decreased, then dividends decreased; if taxable income increased, then dividends increased.

Before 1987, there were no Forms 1099 issued to shareholders for dividends income in the form of payment of travel expenses.

At some point in the period 1980-1986, Berger discussed the travel expenses paid by the Sley Corporations, with someone associated with the Sley Corporations. Berger was told that the travel and entertainment expenses were incurred so that the officers of the Sley Corporations could meet to discuss corporate business, and that there were no personal expenses included in those amounts. Berger had never seen the travel records of the Sley Corporations before the trial, nor had he heard of specific trips taken by petitioner, Betsy, and the children. If Berger would have heard of trips to the resort destinations, described under Travel and Entertainment Expenses, supra, then he would have asked whether the trips were taken for personal or business purposes. If a trip was taken for personal purposes, then Berger would not have deducted the trip expenses on the Sley Corporations' tax return, and he probably would have treated the

Sley Corporations' payment of those expenses as dividends to the shareholders.

Petitioner understood that Berger was not engaged to audit the travel and entertainment expenses of the Sley Corporations.

In calculating income for purposes of preparing petitioner's and Betsy's individual tax returns, Berger and those he supervised used third-party information such as Forms W-2, 1099, and K-1 that petitioner gave to Berger, schedules prepared by the Sley Corporations' bookkeeper, and information on transactions that petitioner had with his law firm.

During the years in issue, petitioner and Betsy were cash-basis taxpayers.

Brown worked for Grant Thornton as a tax specialist from January 1985 to April 1987. Brown worked under Berger's supervision. Berger assigned her to prepare the 1984 tax returns and the compilation financial statements for the Sley Corporations. Pursuant to her assignment to the Sley Corporations' account, Brown was told to prepare trial balances, corporate tax returns, and compilation financial statements, and to make adjustments to the compilation financial statements for accrued income and expenses; she was not told to audit the books of the Sley Corporations. Brown used the books and records prepared by Baybrook to prepare trial balances and then used the

trial balances to prepare the Sley Corporations' tax returns. Brown was not assigned to do, and did not do, any verification of the truth of the figures on the books and records kept by Baybrook.

Baybrook was Brown's primary contact person regarding the Sley Corporations' tax returns during the period February 1985 through March 1986; Brown occasionally spoke to petitioner about the Sley Corporations' tax returns. Brown had no discussions regarding the Sley Corporations' tax returns with either Betsy or Ben before April 1986; Brown had never even met either of them.

In April 1987, Brown ended her employment with Grant Thornton; in May 1987, petitioner and Betsy hired Brown to work for the Sley Corporations. Brown prepared the Sley Corporations' tax returns for 1987 and 1988. As part of her duties, Brown also prepared tax returns for trusts of which Betsy or Ben were beneficiaries.

In 1988 Betsy hired an independent accountant named Olshan, primarily to help with investments. Brown began to discuss the travel expenses and some other matters that she noted on the Sley Corporations' tax returns. As a result of a discussion between Betsy, Brown, and Olshan, in early 1988 Betsy had the Sley Corporations issue a Form 1099 for 1987 dividend income received in the form of payment of travel expenses. Also, for 1988,

Betsy's and Ben's salaries were reduced to $95,000 and Beatrice's salary was reduced to $60,000.

Petitioner and Betsy timely filed joint tax returns for 1983 through 1987. Petitioner timely filed a separate tax return for 1988.[20] On January 30, 1990, petitioner, Betsy, and respondent extended to June 15, 1990, the period for assessment for 1986.

Respondent audited petitioner's and Betsy's 1983 joint tax return sometime before March 1987, and concluded that petitioner and Betsy had overstated their income for that year by $69,885; this overstatement resulted in a $34,942 overstatement of petitioner's and Betsy's 1983 tax liability. The resulting Form 4549 (Income Tax Examination Changes) for 1983, agreed to on March 5, 1987, shows that petitioner and Betsy were entitled to a $69,885 downward adjustment to income for "Sale of Partnership Interest". Petitioner and Betsy reported this item on their 1983 tax return as ordinary income from the sale of "Integrated Natural Gas Partnership." Apparently, petitioner and Betsy received a credit or refund of the $34,942.

---

[20] The tax returns for 1983 through 1987 were filed on or about Apr. 15 of the appropriate years. The tax return for 1988 was filed on July 3, 1989, which was timely because Berger had timely filed, on petitioner's and Betsy's behalf, an application for a 4-month automatic extension to Aug. 15, 1989.

Table 13 sets forth petitioner's and Betsy's 1983 adjusted gross income, taxable income, and income tax liability as (1) shown on their 1983 tax return, (2) adjusted by respondent in 1987, and (3) determined in the notice of deficiency in the instant cases.

Table 13

|  | Tax Return | 1987 Audit--Revenue Agent's Report | Notice of Deficiency[1] |
|---|---|---|---|
| Adjusted gross income | $407,347 | [2] | [2] |
| Taxable income | 354,112 | $284,227 | $309,497 |
| Income tax liability | 160,344 | 125,402 | 138,142 |

[1] These amounts are as shown in the notice of deficiency, and do not take into account respondent's later concessions. See supra note 2.

[2] Adjusted gross income is not shown on the indicated documents.

Respondent audited petitioner's and Betsy's 1985 joint tax return sometime before February 1987, and concluded that petitioner and Betsy had overstated their income for that year by $18,033; this overstatement resulted in a $9,016 overstatement of petitioner's and Betsy's 1985 tax liability. The resulting Form 4549 (Income Tax Examination Changes) for 1985 shows that petitioner and Betsy were entitled to a $8,333 increase in deduction for "Rental Expenses" and a $9,700 increase in deduction for "Contributions". Apparently, petitioner and Betsy

received a credit or refund of the $9,016.  Respondent audited petitioner's and Betsy's 1985 joint tax return again sometime before May 1988, and concluded that petitioner and Betsy had $2,760 of unreported dividend income for that year; this unreported income resulted in a $1,380 understatement of petitioner's and Betsy's 1985 tax liability.  On May 9, 1988, respondent mailed to petitioner and Betsy a notice of deficiency for 1985, based on the $1,380 deficiency; Betsy paid the deficiency.

Table 14 sets forth petitioner's and Betsy's 1985 adjusted gross income, taxable income, and income tax liability as (1) shown on their 1985 tax return, (2) adjusted by respondent in 1987, (3) adjusted by respondent in 1988, and (4) determined in the notice of deficiency in the instant cases.

Table 14

|  | Tax Return | 1987 Audit | [1]1988 Audit | Notice of Deficiency |
|---|---|---|---|---|
| Adjusted gross income | $272,480 | [2] | [2] | [2] |
| Taxable income | 191,733 | $173,700 | $176,460 | $205,679 |
| Income tax liability | 76,110 | 67,094 | 68,474 | 83,398 |

[1]  The notice of deficiency issued in 1988 mistakenly sets forth the "corrected" taxable income and tax liability by making the $2,760 (income) and $1,380 (liability) adjustments as adjustments directly to the amounts set forth on the 1985 tax return as filed, ignoring the adjustments made in the 1987 audit.  The effects of the 1988 audit are correctly shown in the notice of deficiency in the instant cases as the basis for purposes of

calculating the 1985 deficiency that respondent determined in the instant cases.

2  Adjusted gross income is not shown on the indicated documents.

In 1989, Brown photocopied some Sley Corporations records. She turned those records over to respondent's agent in August 1989, and provided other information to that agent.

On June 14, 1990, respondent mailed to petitioner and Betsy a notice of deficiency for 1986.  On April 4, 1991, respondent mailed to petitioner and Betsy a notice of deficiency for 1983, 1984, 1985, and 1987.  Also on April 4, 1991, respondent mailed to petitioner a notice of deficiency for 1988.  Petitioner filed petitions in response to these three notices of deficiency, giving rise to the instant cases.

The notice of deficiency for 1986 was mailed more than 3 years after the 1986 tax return was filed, but within the period agreed upon in the parties' timely extension agreement.  Sec. 6501(c)(4).  The notice of deficiency for 1983, 1984, 1985, and 1987 was mailed more than 3 years after the 1983, 1984, and 1985 tax returns were filed, but within 3 years after the 1987 tax return was filed.  The notice of deficiency for 1988 was mailed within 3 years after the 1988 tax return was filed.

#### Interest Expense for 1987.

At sometime before 1987, Betsy borrowed money from Markette, a portion of which was to be repaid in 1987.  Betsy wrote check

No. 121 on her checking account for $13,167.96 as a payment of interest on the loan and delivered it to Brown sometime between December 22, 1987, and February 12, 1988. The check was dated December 22, 1987. The check was posted to Markette's bank account on February 12, 1988, and to Betsy's checking account on February 16, 1988. Betsy wrote checks in her checking account in numerical order. Check No. 120 was recorded on Betsy's checking account register on November 30, 1987, and check No. 122 was recorded on June 25, 1988.

Starting in December 1987, Betsy and Brown began to pack up the Sley Corporations books and records in boxes because they were going to move the Sley Corporations office out of the Grossman & Flask sublet office space. Betsy arranged to have professional movers move the Sley Corporations office on January 13, 1988.

On their 1987 joint tax return, petitioner and Betsy listed a $13,168 personal interest expense to Markette and deducted 65-percent of it--$8,559--as an itemized deduction on Schedule A.

Respondent disallowed this deduction.

---

For each of the years 1983 through 1986, petitioner had an underpayment of income tax required to be shown on his tax return; some part of the underpayment for each of the years 1985 and 1986 was due to petitioner's fraud.

For 1986, petitioner knew and had reason to know of the underpayment due to his and Betsy's failure to report Betsy's constructive dividends; it would not be inequitable to hold petitioner liable for this underpayment.

OPINION

I.  Statute of Limitations

Petitioner has properly raised in his petition the affirmative defense of the statute of limitations under section 6501(a).  Rule 39.

In general, section 6501[21] bars assessment of an income tax deficiency more than 3 years after the later of (1) the date the tax return was filed, or (2) the due date of the tax return.  If

---

[21]     Sec. 6501 provides, in pertinent part, as follows:

Sec. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

     (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title [title 26, the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

     (b) Time Return Deemed Filed.--

     (1) Early return.--For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.

the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069, 1075-1076 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987).

In the instant cases, we found that the tax returns for 1983, 1984, and 1985 were filed more than 3 years before the notice of deficiency for those years was issued, and that the tax returns for 1987 and 1988 were filed less than 3 years before the notices of deficiency for those years were issued. Although the tax return for 1986 was filed more than 3 years before the notice of deficiency for that year was issued, we found that the parties had timely extended the period for assessment as to 1986, and the notice of deficiency was mailed within that extended period. Thus, the statute of limitations is in issue only for 1983, 1984, and 1985.

Respondent contends that the instant cases fall within the exception to the general period of limitations set forth in

section 6501(c)(1),[22] which provides that if a false or fraudulent return is filed with the intent to evade tax, then the tax may be assessed at any time.[23]  Petitioner contends that respondent has failed to prove fraud by clear and convincing evidence for 1983, 1984, and 1985 and thus, assessment and collection of tax for 1983, 1984, and 1985 are barred by the statute of limitations.

We agree with respondent as to 1985, and with petitioner as to 1983 and 1984.

Respondent has the burden of proving the applicability of the fraud exception to the general period of limitations.

---

[22]     SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

\*   \*   \*   \*   \*   \*   \*

(c) Exceptions.--

   (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

[23]     Proof that either spouse committed fraud on a joint tax return extends the limitations period for both spouses on that tax return, even though only one of the spouses may be liable for the fraud addition to tax.  Hicks Co. v Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st. Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971).  In the joint notices of deficiency, respondent had determined that both Betsy and petitioner had committed fraud for 1983 through 1987.  However, in the instant cases respondent's counsel made it plain at trial that respondent is relying, as to the statute of limitations, solely on the fraud determined against petitioner, and not on any contention that Betsy committed fraud.

Farmers Feed Co. v. Commissioner, 10 B.T.A. at 1075-1076. This burden is the same as that which respondent has under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963).

To carry this burden for a year, respondent must prove two elements, as follows: (1) That petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud. Sec. 7454(a);[24] Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 114 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that

---

[24] SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND
                TRANSFEREE CASES.

   (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.

there is some underpayment and that some part of it is attributable to fraud. E.g., <u>Lee v. United States</u>, 466 F.2d 11, 16-17 (5th Cir. 1972); <u>Plunkett v. Commissioner</u>, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. In carrying this burden, respondent may not rely on petitioner's failure to meet his burden of proving error in respondent's determinations as to the deficiencies. E.g., <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 700 (1989); <u>Habersham-Bey v. Commissioner</u>, 78 T.C. 304, 312 (1982), and cases cited therein.

Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. <u>Drieborg v. Commissioner</u>, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954; <u>Estate of Stein v. Commissioner</u>, 25 T.C. 940, 959-963 (1956), affd. sub nom. <u>Levine v. Commissioner</u>, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. <u>Estate of Mazzoni v. Commissioner</u>, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. 1970-144 and 1970-37; <u>Adler v. Commissioner</u>, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; <u>Otsuki v. Commissioner</u>, 53 T.C. at 108.

The issue of fraud poses a factual question that is to be decided on an examination of all the evidence in the record.

Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224.

In order to establish fraud, respondent must show that petitioner intended to evade taxes, which petitioner knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).  This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioner's explanations, Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), and cases there cited, affg. T.C. Memo. 1984-601; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951.

We consider first whether petitioner has an underpayment of tax for any of the statute of limitations years, and then we consider whether any part of that underpayment is due to fraud.

A. Underpayments of Tax

In order to determine whether there were any underpayments of tax, we first determine whether petitioner had unreported income for 1983 through 1986.[25]

In the notices of deficiency, respondent determined that petitioner and Betsy omitted to report, on their 1983 through 1986 joint tax returns, constructive dividends in the form of personal travel and entertainment expenses paid on behalf of Betsy by Markette. Other adjustments are briefly described supra in notes 2 and 3. On opening brief, however, respondent states that respondent relies only on certain of the travel and entertainment items to carry the fraud burden of proof. The latter items are listed in table 15. Table 15 also shows the totals of the travel and entertainment constructive dividend adjustments in the notices of deficiency. Because a year is "open" under section 6501(c)(1) only if respondent succeeds in proving by clear and convincing evidence that there is an underpayment due to fraud, we focus in this part of the opinion on only the items listed in table 15.

_____

[25] We have determined, supra, that the statute of limitations is in issue only for 1983, 1984, and 1985. Nevertheless, we consider petitioner's 1986 actions at this point because any pattern established may have a bearing on our analysis of other years. E.g., Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100.

Table 15

| | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|
| Miami, Fla. | $1,302.00 | $1,616.50 | $397.00 | $1,854.00 |
| | | 716.00 | 2,166.00 | 1,777.58 |
| | -- | -- | -- | 1,570.50 |
| Miami, Key West, Fla. | -- | -- | -- | 3,216.73 |
| Hawaii | 5,326.51 | -- | -- | -- |
| Lake Tahoe, Nev. | 1,351.50 | -- | 630.00 | -- |
| L.A. Olympics | 1,359.55 | 2,057.00 | -- | -- |
| New York, N.Y. | 990.34 | -- | -- | -- |
| Orlando, Fla. | -- | 780.00 | -- | -- |
| Acapulco, Mexico | -- | -- | 3,682.24 | -- |
| Stamford, Conn. | -- | -- | 349.63 | -- |
| Corpus Christi, Tex.[1] | -- | -- | 1,137.50 | 983.78 |
| San Diego, Calif. | -- | -- | 450.00 | -- |
| Canada | -- | -- | 3,610.37 | -- |
| Los Angeles, Calif. | -- | -- | 457.00 | -- |
| Snowmass, Colo. | -- | -- | -- | 2,019.37 |
| Western Trip | -- | -- | -- | 1,009.00 |
| Miscellaneous Washington | -- | -- | -- | 846.36 |
| Annual Fee | -- | -- | -- | 45.00 |
| Totals--fraud per respondent's brief | 10,329.90 | 5,169.50 | 12,879.74 | 13,322.32 |
| Total Travel and entertainment adjustments --notice of deficiency | 18,611.70 | 13,452.26 | 23,014.34 | [2]11,659.62 |

[1] Respondent does not set forth the amounts of the Corpus Christi, Texas, trips constructive dividends at the same place in the brief at which the other amounts are listed. The amounts we show for the Corpus Christi constructive dividends are taken from Appendix VI to respondent's opening brief.

[2] See infra text following note 29 for discussion of the effect of unexplained allowance items in the notices of deficiency.

Section 61(a)(7) includes dividends in gross income.

Section 316(a) provides that a dividend is any property

distributed by a corporation to its shareholders out of post-1913

accumulated or current earnings and profits.[26]  Sec. 316(a).  A distribution taxable as a dividend under section 301 may be found even though the corporation has not formally declared a dividend or even intended to distribute a dividend.  Loftin and Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974); Hash v. Commissioner, 273 F.2d 248, 250 (4th Cir. 1959), affg. T.C. Memo. 1959-96.  Accordingly an expenditure made by a corporation for the personal benefit of one of its shareholders, or the personal use of corporate property by a shareholder, may result in the shareholder's being treated as having received a constructive dividend.  Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Commissioner v. Riss, 374 F.2d 161, 170 (8th Cir. 1967), affg. on this issue and revg. on another issue T.C. Memo. 1964-190;  Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962), and opinions there cited.  See also Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929).

In determining whether constructive dividends have been received, the key factors are whether the shareholders received

---

[26]     Petitioner has not argued that Markette's earnings and profits for 1983 through 1986 were insufficient to cover any of the determined constructive dividends.  Thus, we do not redetermine the amounts of the relevant earnings and profits, nor do we address the "wrongful diversion" and sec. 312 issues dealt with in Hagaman v. Commissioner, 958 F.2d 684, 692 (wrongful diversion), 695 (sec. 312) (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549.

economic benefits from the corporation without expectation of payment therefor, Ireland v. United States, 621 F.2d at 735; United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969), and opinions there cited, and whether the company-provided benefits made available to the shareholders were primarily of a personal nature rather than in the business interests of the corporation. Ireland v. United States, 621 F.2d at 735; Loftin and Woodard, Inc. v. United States, 577 F.2d at 1215-1217.

The fact that certain payments are not deductible by a corporation as business expenses, does not automatically result in income to that corporation's shareholder. The disallowed expenses also must represent an economic gain or benefit to the shareholder. See Dolese v. United States, 605 F.2d 1146, 1152 (10th Cir. 1979); Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Ashby v. Commissioner, 50 T.C. 409, 418 (1968). Whether a shareholder received a constructive dividend is a question of fact. Loftin and Woodard, Inc. v. United States, 577 F.2d at 1215. See generally, Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.05[8] at 8-48 (6th ed. 1994).

The disputed items we deal with in the fraud portion of the opinion are predominantly travel expenses. Where respondent has succeeded in establishing that the travel was by petitioner, Betsy, and the children to a vacation resort or for a family

function, petitioner contends that the Sley Corporations business purpose in most such instances is that the travel was undertaken so that Betsy could confer with Beatrice or petitioner, or sometimes with Ben, about Sley Corporations business.

Petitioner states his view of the situation as follows in his answering brief:

> Every trip Petitioner and Betsy took was partly related to business.  On the trips, petitioner and Betsy would talk about business and about the Sley Corporations continuously.

> In the context of closely held, personal holding companies differentiating between shareholder purpose and corporate purpose makes no sense because the shareholders and their corporation generally have identical interests.

Of course, a trip that is primarily for the taxpayer's individual pleasure is not converted into a business trip merely because some short portions of the trip involve business activities, even when it is clear that the asserted business activities actually occurred and that those business activities actually affected the cost of the trip.  This has been the rule under section 162 and its predecessors, even without regard to the restrictions of section 274, enacted in 1962.  E.g., George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. 686 (1984); Hoover v. Commissioner, 35 T.C. 566 (1961).

In the instant cases, we doubt that there were significant business discussions on these trips.  Petitioner's general testimony about business discussions was sometimes disputed by

Betsy; where it was supported by Betsy, in almost all instances Betsy's testimony was no more believable on this point than petitioner's. For example, we simply do not believe that petitioner, Betsy, and the children spent thousands of dollars to travel to Miami during the 6 months or so each year that Beatrice was there, simply to facilitate Sley Corporations business discussions, or even in significant part to have such discussions. We do not believe Betsy's testimony that, when she and the children were in Miami for a week she and Beatrice spent 1-2 hours a day discussing Sley Corporations business.

We consider the disputed items year-by-year and, for any year, trip-by-trip in the order appearing <u>supra</u> in table 15.

(1) 1983

<u>Miami</u>

Markette paid $1,302 airfare for petitioner, Betsy, and the children to fly to Miami in early 1983 to visit Beatrice. See Findings <u>Check No. 1862--Miami</u>, <u>supra</u>.

In the context of the entire record, we are convinced that the Miami trips in general, and this early 1983 Miami trip in particular, were primarily personal and that Sley Corporations' business, if it was discussed at all, was at most an incidental, side aspect.

The personal nature of the Miami trips is demonstrated by the fact that these were trips taken by the entire household to

visit Betsy's mother, the children's grandmother.  In addition, petitioner and Betsy grew up in the Miami area, and petitioner's parents lived in the Miami area during at least some of the years in issue.

Another indication of the personal nature of these trips is that petitioner and Betsy did not make notes of what business activities occurred on the trips.  The general rule as to allowance of deductions for ordinary and necessary expenses paid or incurred during the taxable year for trade or business purposes, is now codified at section 162.  Section 274, originally enacted as part of the Revenue Act of 1962, imposes requirements in addition to those of section 162 for the deductibility of travel and entertainment expenses incurred in the conduct of a trade or business; subsection (d) of section 274 mandates specific substantiation requirements.  Petitioner has been a tax attorney since 1971; we believe that during the years in issue, he knew of the substantiation requirements of section 274(d).  If the trips to Miami were indeed business trips, then we believe petitioner would have kept the records required by section 274.  Thus, petitioner's exceptional knowledge of the tax laws coupled with the fact that no records were kept of what petitioner claims were business expenses, is further evidence that leads us to conclude that the trips to Miami were not business trips.

We conclude, and we have found, that the trip to Miami was primarily of personal nature. Markette's payment of $1,302 of the expenses of this trip constitutes a constructive dividend to Betsy from Markette in this amount.

We hold for respondent on this issue.

Hawaii

Markette paid $2,014.69 of charges that petitioner made on his Markette American Express credit card that was associated with a trip to Hawaii taken by petitioner, Betsy, and the children. Of this amount, a $39.95 airline ticket related to the Hawaii trip later was refunded by way of a credit against the Los Angeles Olympics tickets bill, discussed infra. Respondent also contends that the $3,311.82 debit memorandum dated June 2, 1983, was an expenditure by Markette associated with the trip to Hawaii and that this expenditure had a primarily personal purpose. We have found that the primary purposes of the trip to Hawaii were (1) for petitioner to appear as a panelist on a video conference to be broadcast from Hawaii by satellite, (2) meet Ruff in person, and (3) to take a family vacation. See Findings Check No. 1896, Debit Memo--Hawaii, supra.

Petitioner's appearance on the video conference may have been significant in enhancing his reputation as a tax lawyer, although it appears to have netted him only one client, but no Sley Corporations purpose has been suggested as being served by

this appearance.[27]  Petitioner's opportunity to meet Ruff might conceivably have served a Sley Corporations purpose, but we have no information suggesting that petitioner or Betsy learned, or even sought to learn, anything from Ruff that would have been of use to the Sley Corporations.

Petitioner's role in the video conference on Oahu lasted only about a few hours, with perhaps some studio preparation the day before.  Petitioner and Betsy visited Ruff's operations on Maui, but the record does not indicate that this was anything more than a walk-through.  On the other hand, petitioner, Betsy, and the children were in Hawaii for 10 days or more.  Thus, substantially all of the time that petitioner, Betsy, and the children spent in Hawaii was spent having a family vacation--clearly a personal purpose and not a Sley Corporations' business purpose.

We conclude, and we have found, that there was no, or practically no, Sley Corporations business purpose for the Hawaii trip, and the predominant purposes of the Hawaii trip were personal pleasure and Grossman & Flask business.

However, we do not agree with respondent's contention that Betsy should be charged with $5,326.51 constructive dividend

---

[27]  Petitioner has not contended for, or pointed to evidence as a basis for, any allowance of an offsetting deduction on account of his trade or business as a lawyer.

income on account of this trip. Firstly, $39.95 of the amount Markette paid by its check No. 1896 on account of this trip was refunded to Markette by way of a credit against the Los Angeles Olympics tickets bill discussed infra. As we understand respondent's contentions, respondent includes the $39.95 in the Hawaii trip expenses (because that was paid as part of Markette's check No. 1896 payment of the July 1983 American Express invoice) and also includes the $39.95 in the Los Angeles Olympics expenses (because the credit was used against the charge for Olympics tickets paid as part of Markette's payment of the August 1983 American Express invoice). This is improper double-counting. We conclude, and we have found, that the $39.95 is not properly an expense of the Hawaii trip.

Secondly, our Findings of Fact detail the little information that the record reveals about the $3,311.82 debit memorandum. Respondent's conclusion that this is properly a Markette expenditure for a constructive dividend purpose is neither adequately supported nor adequately refuted by evidence in the record. Respondent, who has the burden of proving on this issue that the debit memorandum represents an economic gain or benefit to Betsy, Dolese v. United States, 605 F.2d at 1152; Falsetti v. Commissioner, 85 T.C. at 356-357; Ashby v. Commissioner, 50 T.C. at 418, must bear the consequence of failing to carry that burden.

We conclude that the trip to Hawaii was primarily of a personal nature. Respondent proved by clear and convincing evidence that $1,974.74 ($2,014.69 minus $39.95) of Markette's expenditures for this trip was associated with that purpose. Thus, Betsy received a $1,974.74 constructive dividend in 1983 from Markette.

We hold for respondent as to $1,974.74 and for petitioner as to $3,351.77 ($3,311.82 plus $39.95), on this issue.

Lake Tahoe

Markette paid $1,351.50 for round-trip airline tickets for petitioner, Betsy, and their children to visit Lake Tahoe. See Findings Check No. 1896--Lake Tahoe, supra. However, petitioner did not go on that trip, and American Express refunded the $318 cost of his ticket. Thus, the net Markette payment for this trip was $1,033.50. Betsy testified that the primary purpose of the family's usual midsummer Lake Tahoe trips was pleasure, and we have found that that was the primary purpose of this trip.

On brief, petitioner refers to (1) Betsy's testimony that "we looked at investment properties around the Tahoe area" and (2) his testimony "that he talked about the corporations' assets with Betsy 'every waking moment, maybe too much.'" Firstly, there is no basis for allocating any part of the expenses of this Lake Tahoe trip to Sley Corporations business, as distinguished from petitioner's and Betsy's personal and family purposes.

Secondly, petitioner did not go on that trip, so he could not have "looked at investment properties" with Betsy on that trip. Thirdly, Betsy testified that she never did anything about the alleged investment property examination.

We are satisfied that respondent has shown by clear and convincing evidence that the 1983 Lake Tahoe trip was for personal pleasure and not for Sley Corporations' business, and that Markette's payment of the cost of the airline tickets constituted income to Betsy, reportable on petitioner's and Betsy's 1983 joint tax return.

However, we do not agree with respondent's contention that petitioner and Betsy should be charged with $1,351.50 constructive dividend income on account of this trip. We have found that $318 of the amount Markette paid by its check No. 1896 on account of this trip was refunded to Markette by way of a credit against the Los Angeles Olympics tickets bill discussed infra. As we understand respondent's contentions, respondent includes the $318 in the Lake Tahoe trip expenses (because that was paid as part of Markette's payment of the American Express July 1983 invoice) and also includes the $318 in the Los Angeles Olympics expenses (because the credit was used against the charge for Olympics tickets paid as part of Markette's payment of the American Express August 1983 invoice). This is improper double-

counting. We conclude, and we have found, that the $318 is not properly an expense of the Lake Tahoe trip.

We conclude that the trip to Lake Tahoe was primarily of a personal nature. Respondent proved by clear and convincing evidence that $1,033.50 ($1,351.50 minus $318) of Markette's expenditures for this trip were associated with that purpose. Thus, Betsy received a $1,033.50 constructive dividend from Markette.

We hold for respondent as to $1,033.50 and for petitioner as to $318, on this issue.

### Los Angles Olympics

Markette paid $1,359.55 for tickets to the 1984 Los Angeles Olympics to be used (and in 1984 in fact used) by petitioner, Betsy, and the children. See Check Nos. 115417 and 1896--1984 Olympics, supra. This payment was made by issuance of a check in the amount of $1,001.60, and application of credits on Markette's American Express invoice on account of a $39.95 overpayment resulting from the Hawaii trip, see supra, and a $318 overpayment resulting from the Lake Tahoe trip, see supra. See supra table 6.

Apart from his general contention that "on every trip, Betsy and petitioner discussed the business of her multimillion dollar enterprise", petitioner does not suggest that there was any Sley Corporations business purpose for Markette to buy the tickets, or

for himself, Betsy, and the children to go to the Los Angeles Olympics in 1984, and we do not perceive any such business purpose.

Petitioner testified that Betsy told him that she would reimburse Markette, but she did not in fact reimburse Markette.

We conclude, and we have found, that the tickets to the 1984 Los Angeles Olympics were personal.  Respondent proved by clear and convincing evidence that Markette paid $1,359.55 for these tickets.  Thus, Betsy received a $1,359.55 constructive dividend from Markette.

We hold for respondent on this issue.

New York

Markette paid $496 for airfare and $494.34 for hotel and meals for a trip to New York, N.Y., on September 9, 1983, and a return on September 11, 1983, for petitioner, Betsy, and the children.  See Findings Check Nos. 1903 and 1912--New York City, supra.  On opening brief, petitioner "concedes that any travel related to the children is a constructive dividend."  As detailed in our findings, supra, of the total $990.34, we have attributed $520 to the children and the remaining $470.34 to petitioner and Betsy.

We have accepted petitioner's and Betsy's testimony to the effect that the purpose of this trip was for petitioner and Betsy to go to the "diamond district" in New York City to talk with

diamond brokers about selling the Sley Corporations' diamonds. We have accepted their testimony that this was not a vacation trip.

We conclude, and we have found, that the expenditures for the children on this New York trip were for personal purposes and not for Sley Corporations business purpose. Thus, Betsy received a $520 constructive dividend from Markette.

We hold for respondent as to $520, and for petitioner as to $470.34, on this issue.

### Summary--1983

Our fraud issue holdings as to 1983 constructive dividends are summarized in table 16.

Table 16

| 1983 Trip | Respondent's Contention on Brief | Court's Holding |
|---|---|---|
| Miami | $1,302.00 | $1,302.00 |
| Hawaii | 5,326.51 | 1,974.74 |
| Lake Tahoe | 1,351.50 | 1,033.50 |
| L.A. Olympics | 1,359.55 | 1,359.55 |
| New York | 990.34 | 520.00 |
| Totals | 10,329.90 | 6,189.79 |

(2) 1984

### Miami

On February 21, 1984, Markette issued check No. 1946 to Eastern Airlines, Inc., in the amount of $1,616.50.

Apart from photocopies of the front and back of the check, the only evidence in the record as to this item is the following colloquy:

Q [McDougal] Check number 1946 should be probably a couple page down for Eastern Air, $1616.50, February 17, 1984. Would that be for a Miami trip?

A [Betsy] I haven't found it yet.

Q I'm sorry.

A Okay, I found it. It might be. I don't have the bills to match it up.

Q But that time of year would Eastern Airline's flights have been to Miami?

A Most likely.

We cannot determine from the foregoing whether or not Betsy received a constructive dividend on account of that payment. Respondent has failed to carry the burden of proving that constructive dividend by clear and convincing evidence.

We hold for petitioner on this issue.

Miami

On or about August 5, 1984, Betsy charged a round-trip ticket on Pan American World Airways to Miami for $716. Markette paid for this on October 8, 1984, by check No. 2008.

Apart from photocopies of the front and back of the check; photocopies of the fronts of the charge slip, the September invoice, and the invoice stub; and the fact that petitioner's and Betsy's son was 8 years old at the time, the only evidence in the record as to this item is the following colloquy:

Q [McDougal] If you'll turn back to Exhibit AQ again, please, page 15. On the invoice at the bottom is an American Express charge for Pan Am ticket for G. Grossman

from Dulles to Miami in the amount of $716.  Your son's name begins with a "G"--Geoffrey?

    A  [Betsy]  Yes.

    Q  Would that pertain to him?

    A  Well, I have a son named Geoffrey.

    Q  Do you remember sending him on a flight to Florida in 1984?

    A  I'm not sure.  This is an awful large amount for one ticket.

    Q  You think it might have been more than one ticket?

    A  What?

    Q  Do you think it might have been for more than one ticket?

    A  I have no idea.  Usually my children are in camp in August, until about the middle of August.  I'm not really sure.

    Q  During this general period of time, ‹83 through ‹86, do you recall sending your son to Florida, say to visit his grandparents?

    A  We usually went to Tahoe in August, after the children came home from camp, so I'm not really sure about this ticket, or this invoice.

    Q  Do you remember any time during this general period of time when you sent your son to Florida to meet with his grandparents?


    A  I don't think I would have sent him by himself.  He was too young.

    Q  So you don't know what this ticket is for?

    A  No, I can't tell you.

We cannot determine from the foregoing whether or not Betsy received a constructive dividend on account of that payment. Respondent has failed to carry the burden of proving that constructive dividend by clear and convincing evidence.

We hold for petitioner on this issue.

Los Angeles Olympics

On July 20, 1984, Markette issued check No. 1987 to United Airlines, in the amount of $2,057. Apart from photocopies of the front and back of the check, and testimony that petitioner, Betsy, and the children had attended the 1984 Olympics (for which Markette had bought them tickets in 1983), the only evidence in the record as to this item is the following colloquy:

> Q [McDougal] One more check in [Exhibit] AP, Mrs. Grossman, number 1987. That should be a check to United Airlines and it appears that there are five ticket numbers noted at the top.

> A [Betsy] I don't know what's noted at the top.

> Q At the end of that long number, does that appear to be a sequence of five tickets?

>       *      *      *      *      *      *

> Q Mrs. Grossman, I don't have the number right in front of me, but does it appear to you that that number refers to a series of about five ticket numbers?

> A I can't read the number. I don't know if they are numbers or letters. It's not--I must need better glasses. I can't tell you.

> Q I can't read it to you. We'll just move on. The check was written I believe July 20th 1984.

> A That's what it says.

Q  The Olympics that year were late July and early August of 1984?

A  Yes.

Q  Would you have flown United Airlines to the Olympics?

A  I don't remember.

Q  So you don't know whether this check went to the Olympics or not?

A  The check didn't go to the Olympics.  The check is written out to United Airlines.

Q  My question was very poorly worded.  You don't have any idea whether this check related to the Olympics trip?

A  I can't say for sure.

Q  Do you remember any business trips you took on behalf of Markette Corporation at around the time of the Olympics?

A  I can't say for sure.

We cannot determine from the foregoing whether or not Betsy received a constructive dividend on account of that payment. Respondent has failed to carry the burden of proving that constructive dividend by clear and convincing evidence.

We hold for petitioner on this issue.

Orlando

On September 27, 1984, petitioner, Betsy, and the children flew to Orlando, Florida; they returned on September 30, 1984. See Findings Check No. 2008--Orlando, supra.  Betsy testified that they went to Orlando to meet Ben at Walt Disney World.  She

testified that Ben had "some kind of new computer system that he was working with futures in the market."

We are satisfied that, when parents take their three children (then aged 14, 11, and 8) to Walt Disney World on a 3-day trip, the trip is for personal purposes unless something appears in the record to lead us to a different conclusion. The only suggestion in the record as to a Sley Corporations business purpose is Betsy's reference to Ben's "computer system". There is no evidence of any discussions at Walt Disney World about the Sley Corporations possible use of whatever Ben had found or developed, nor is there anything in the record indicating why it made business sense to travel from Washington, D.C., to Orlando (and, in Ben's case, from Corpus Christi to Orlando) for any such discussions. See George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. at 701-702.

As we have found, Markette's American Express October invoice showed an $860 credit on account of an item paid for on the August invoice and carried over to the September invoice. The September invoice was paid. The October invoice also showed the $780 charge for the Orlando tickets. This left a credit balance of $80 to be carried over to the next invoice. Thus the Orlando tickets were indirectly paid for by Markette's check No. 2008.

We are satisfied, and we have found, that respondent has shown by clear and convincing evidence that the Orlando trip was for personal pleasure and not for Sley Corporations business. We conclude that Markette's payment of the cost of the airline tickets constituted constructive dividend income to Betsy, reportable on petitioner's and Betsy's 1984 joint tax return.

We hold for respondent on this issue.

Summary--1984

Our fraud issue holdings as to 1984 constructive dividends are summarized in table 17.

Table 17

| 1984 Trip | Respondent's Contention on Brief | Court's Holding |
| --- | --- | --- |
| Miami | $1,616.50 | -- |
| Miami | 716.00 | -- |
| L.A. Olympics | 2,057.00 | -- |
| Orlando | 780.00 | $780 |
| Totals | 5,169.50 | 780 |

(3) 1985

Miami

Markette paid $397 for airfare to Miami for the children that Betsy charged on her Markette American Express credit card. Our Findings of Fact (Check No. 2036--Miami--Children, supra) detail the arrangements that led to the children flying from New York to Miami on December 26, 1984. It is clear that the children were on vacation in New York and traveled from there to

Miami to meet their grandmother, Beatrice. Petitioner does not even bother to suggest a possible Sley Corporations business purpose, and we have found that the Miami trip was for a personal family vacation purpose. Betsy testified that "The reason that they [the children] went to Miami was because of the babysitter situation."

We are satisfied that respondent has shown by clear and convincing evidence that the children's Miami trip was for personal purposes and not for Sley Corporations business, and that Markette's payment of the cost of the airline tickets constituted constructive dividend income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.

<u>Miami</u>

On February 4, 1985, Markette issued check No. 2043 to Eastern Airlines, Inc., in the amount of $1,192. On February 26, 1985, Markette issued check No. 2051 to Eastern Airlines, Inc., in the amount of $974.

Apart from photocopies of the fronts and backs of the checks, totaling $2,166, the only evidence in the record as to this item is the following colloquy:

> Q [McDougal] If you'll turn, please, to page 20, we will skip the Marriott invoice at the top because it does not appear to have been charged to the corporation.

> Mrs. Grossman, would you look at AP, the checks, the '85 section, check number 2043, which is about the fifth

page down.  There's a check to Eastern Airlines for $1192 on February 24th.  It's about three pages beyond that, 2051, Eastern Airlines in the amount of $974 again in February '85.

      \*      \*      \*      \*      \*      \*      \*

THE COURT: Now what was your question again?

MR. McDOUGAL:  The question is would Eastern Airline tickets purchased at that time of year be for the spring Miami trip.

THE WITNESS [Betsy]: I have no idea what they're for.

BY MR. McDOUGAL:

Q  I'm sorry?

A  I have no idea what they were for in February.

Q  Do you recall flying Eastern Airlines for trips other than to Miami?

A  No.

Q  We just looked at 2051.  The check above that, 2050, is American Express, February 26th 1985 for $2002.25.

If the Eastern checks were for a trip to Miami, would the American Express charges for the same period be for some other purpose?

A  I don't know.

Although respondent referred to Markette check No. 2050 in the colloquy and determined in the notice of deficiency that the amount of that check ($2,002.25) also was constructive dividend income to Betsy, the record does not include information shedding further light on check No. 2050 or its connection to check Nos. 2043 and 2051.

We cannot determine from the foregoing whether Betsy received a constructive dividend on account of the $2,166 payment by check Nos. 2043 and 2051.  Respondent has failed to carry the burden of proving that constructive dividend by clear and convincing evidence.

We hold for petitioner on this issue.

<u>Lake Tahoe</u>

Markette paid for $630 of airfare to Reno--$420 round-trip for Betsy and $210 Reno-to-Washington, D.C., for petitioner.  See Findings <u>Check No. 2108--Lake Tahoe</u>, <u>supra</u>.  Betsy testified as follows regarding this trip:

> Q [McDougal] So this trip would be purely personal.
>
> A [Betsy] Well, we went out there and I guess it was basically personal.  We were there by ourselves.  We probably took sometime to talk about what was going on with the business.

Betsy flew to Reno on August 7, 1985.  The record does not indicate when petitioner went there, or how his flight there was paid for.  Betsy and petitioner flew back on August 11, 1985.  As we noted in analyzing the 1983 Lake Tahoe trip, Betsy testified that the primary purpose of the family's usual midsummer Lake Tahoe trips was pleasure.  We have found that the 1985 Lake Tahoe trip, almost precisely in the middle of the summer, also was taken primarily for pleasure.

Respondent has shown by clear and convincing evidence that petitioner's and Betsy's Lake Tahoe trip was for personal

purposes and not for Sley Corporations business, and that Markette's payment of the cost of the airline tickets constituted constructive dividend income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.

Acapulco

Markette paid $3,682.21 on account of an April 1985 trip by petitioner, Betsy, and the children to Acapulco. See Findings Check Nos. 2084, and 2092--Acapulco, supra. Betsy testified as follows regarding this trip:

> Q [McDougal] Thank you. I'm going to ask you to move back to [Exhibit] AQ again, this time page 19. The invoice on page 19, both pages, show charges for the Acapulco Princess in Mexico and a couple of other charges in Mexico, and page 21 appears to show the backup charge slips for that invoice.
>
> Do you recall the purpose of the trip to Acapulco?
>
> A [Betsy] The purpose was a spring vacation trip.
>
> Q Did it have anything to do with the business of Markette Corporation?
>
> A Not specifically.

Petitioner's analysis of the Sley Corporations business purpose of this trip is as follows:

> Betsy and petitioner travelled to destinations that were conducive to business discussions, and business discussions were held. (P.R.F. ¶ 463). The Grossman house was being renovated, (P.R.F. ¶ 510), and was at that time an unsuitable forum to discuss Sley System business. * * * [There follows an attack on respondent's expenditures of "tax money he collects in cases like the one at bar."]

Petitioner worked in a busy law office. (P.R.F. ¶ 57(A)). He devoted 99.99 percent of his time to his law firm. (P.R.F. ¶ 57(A)). The trips to Mexico and Canada preceding the end of his marriage were trips where Markette Corp. business was discussed and the expenses paid are not dividends to petitioner.

Obviously, Betsy and petitioner had substantial trouble communicating at home. When Betsy and petitioner travelled to Acapulco and Canada, Markette Corp. business was discussed. (P.R.F. ¶¶ 512, 518).

We are satisfied that Betsy's testimony captured the essence of the situation. Respondent has shown by clear and convincing evidence, and we have found, that petitioner's, Betsy's, and the children's Acapulco trip was for personal purposes and not for Sley Corporations business. We conclude that Markette's payment of the costs of the trip constituted income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.[28]

Stamford

Markette paid a $59.63 bill from Le Pavillon, dated June 8, 1985, that petitioner charged on his Markette American Express credit card. This expenditure was associated with a trip to Stamford, Connecticut, to attend a bar mitzvah. On the same day, petitioner and Betsy charged two adult ($65 ea.) and four

---

[28] On brief, respondent asserts that Betsy had $3,682.24 constructive dividend income on account of the Acapulco trip. Our addition comes to $3,682.21, and we have so found. The latter number appears to be consistent with respondent's determination in the notice of deficiency. Our holding is for the latter number.

children's ($40 ea.) one-way shuttle airline tickets between Washington, D.C., and New York. Markette also paid the $290 cost of these airline tickets. See Findings Check Nos. 2092 and 2098--Stamford, supra. The trip to Stamford to attend the bar mitzvah was personal and not on Sley Corporations business. Although the evidence of record as to the $290 is equivocal, petitioner appears to concede that the shuttle travel was the Washington-New York or the New York-Washington portion of the Stamford trip. Petitioner's only contention on this point, on answering brief, is that "the $290 trip to the New York diamond market was a legitimate business expense."

Although it is clear that the Stamford trip is entirely personal (and thus the $59.63 is entirely personal), we cannot tell from the record how the six shuttle tickets fit in, and what was the length and nature of the associated New York City trip. Betsy, for example, could not recall any trip to New York with four children.

Respondent has shown by clear and convincing evidence, and we have found, that petitioner's and Betsy's Stamford trip was for personal purposes and not for Sley Corporations business. We conclude that Markette's payment of the $59.63 item related to this trip constituted income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return. Respondent has failed to make the same showing as to the shuttle tickets.

We hold for respondent as to $59.63, and for petitioner as to $290, on this issue.

Corpus Christi

Markette paid $1,137.50 for round-trip airfare to Corpus Christi, Texas, for Betsy and the children. See Findings Check No. 2098--Corpus Christi, supra.

Betsy testified as follows regarding this Corpus Christi trip:

> Q [McDougal] Do you remember the purpose of the trip?
>
> A [Betsy] I think my mother was out there and I think I had gone out there to meet with my mother and my brother.
>
> Q And was that for the business of Markette Corporation.
>
> A I think there was some business that was discussed.
>
> Q Was that the primary purpose of the trip?
>
> A I don't remember specifically.
>
> Q What interest did Markette Corporation have in having your children go to Corpus Christi?
>
> A I don't know. I mean all these bills were given over to Harvey Berger and it was not my procedure to ever really question what was done with these things.

Respondent has shown by clear and convincing evidence, and we have found, that Betsy's and the children's Corpus Christi trip was for personal purposes and not for Sley Corporations' business. We conclude that Markette's payment of the $1,137.50 airfare constituted constructive dividend income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.

San Diego

Markette paid $450 for Betsy's round-trip airfare to San Diego.  See Findings Check No. 2098--San Diego, supra.

Betsy testified as follows regarding this trip:

> Q  [McDougal] Now the invoice back on page six also shows an American Airline charge of $450.  Do you see that?  It's the next charge down after the U.S. Air charges.
>
> A  [Betsy] Yes.
>
> Q  Page eight shows a receipt in your name from Dulles to O'Hare to San Diego in the amount of $450, at the bottom of the page.
>
> A  Yes.
>
> Q  What was the purpose of the trip to San Diego?
>
> A  I had gone out there myself.
>
> Q  For what purpose?
>
> A  Pleasure.

On answering brief, petitioner's only response seems to be "Petitioner knew nothing about said trip."

Respondent has shown by clear and convincing evidence, and we have found, that Betsy's San Diego trip was for personal purposes and not for Sley Corporations business.  We conclude that Markette's payment of the $450 airfare constituted constructive dividend income to Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.

Canada

Markette paid $3,610.37 for expenses of petitioner, Betsy, and the children on a trip to Canada. See Findings Check Nos. 2098 and 2108--Canada, supra. When asked what the purpose was of this 10-day August 1985 trip, Betsy testified that "Basically it was a family trip." On answering brief, petitioner states that "While in Canada, Betsy Grossman and petitioner continually discussed Markette Corp. business." We do not believe petitioner's protestations about "continually" discussing Sley Corporations business in Buffalo, Montreal, Toronto, Ottawa, and places in between.

At trial, petitioner appeared to have acknowledged that the expenses of the Canada trip should have been subject to an "allocation * * * to do the right thing". However, taking into account factors described in George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. at 701-702, and the allocations we made in that opinion, the record herein leads us to the conclusion that no allocation should be made in the instant cases; all the Canada trip expenses here in dispute are personal.

Respondent has shown by clear and convincing evidence, and we have found, that petitioner's, Betsy's, and the children's Canada trip was for personal purposes and not for Sley Corporations business. We conclude that Markette's payment of the costs of the trip constituted constructive dividend income to

Betsy, reportable on petitioner's and Betsy's 1985 joint tax return.

We hold for respondent on this issue.

Los Angeles

Markette paid $457 for petitioner's airfare from Los Angeles to Washington, D.C., that petitioner charged on his Markette American Express credit card. See Findings Check No. 2100--Los Angeles, supra.

Respondent asked Betsy about the airline ticket, and Betsy testified that she did not remember anything about the trip and did not "specifically" remember anything about petitioner's being in Los Angeles on Sley Corporations business. Respondent did not ask petitioner about the trip, and petitioner did not testify about it.

Respondent has failed to show by clear and convincing evidence that petitioner's Los Angeles trip was for personal purposes and provided a benefit to Betsy.

We hold for petitioner on this issue.

Summary--1985

Our fraud issue holdings as to 1985 constructive dividends are summarized in table 18.

Table 18

| 1985 Trip | Respondent's Contention on Brief | Court's Holding |
|---|---|---|
| Miami | $397.00 | $397.00 |
| Miami | 2,166.00 | -- |
| Lake Tahoe | 630.00 | 630.00 |
| Acapulco | 3,682.24 | 3,682.21 |
| Stamford | 349.63 | 59.63 |
| Corpus Christi | 1,137.50 | 1,137.50 |
| San Diego | 450.00 | 450.00 |
| Canada | 3,610.37 | 3,610.37 |
| Los Angeles | 457.00 | -- |
| Totals | 12,879.74 | [1]9,966.71 |

[1] Table 10, supra, shows that we found that Betsy had $10,164.71 of constructive dividend income from 1985 Markette payments for personal travel and entertainment expenses.  The $198 difference between that amount and the $9,966.71 shown in table 18 is accounted for by Betsy's round-trip ticket to Miami, described in our findings of Check No. 2036--Miami--Betsy, supra.  Respondent included that item in the notice of deficiency, but not in the listing of fraudulent items.

(4) 1986

On answering brief, petitioner contends as follows:


12. 1986 trips.

Respondent contends at pages 124 - 126 of her [opening] brief that Betsy had constructive dividend income from corporate expenditures which was fraudulently omitted from petitioner's 1986 joint return.  Petitioner in his Opening Brief at pages 177 - 184, inclusive, argues that he is an innocent spouse for 1986.  Petitioner relies on his innocent spouse argument as his response to respondent's 1986 constructive dividend claim.  Petitioner neither signed nor saw Markette's 1986 tax return.  P.R.F. ¶ 255(A).

The pages of respondent's opening brief to which petitioner refers are where respondent details respondent's contentions as to fraudulently omitted constructive dividends totaling $13,322.32. See supra table 15. Thus, petitioner appears to concede these omissions, although contesting his involvement in these omissions and in any fraud that might be associated therewith. Despite petitioner's broad concession, however, we reduce this $13,322.32 figure by (1) $6,117.68 of allowances by respondent and (2) $1,241.21 of expenses determined by respondent to be fraudulently omitted constructive dividends, but with respect to which we did not find a personal purpose.[29]

In the notice of deficiency for 1986, respondent determined that omitted constructive dividend income was only $11,659.62. See supra table 11. This resulted from respondent's allowing a total of $6,117.68 from the challenged items--the sum of the four adjustments shown on supra table 12, in connection with check Nos. 2137 ($1,674), 2162 ($3,057.61), and 2220 ($598), and the $788.07 adjustment not related to a specific check. Although there is some suggestion that respondent has had second thoughts about some or all of those allowances, respondent has not moved to amend the answer to reduce the amount of any of these allowances. Also, respondent has failed to clarify precisely

[29] On the other side of the coin, we found that certain expenses had a personal purpose, with respect to which respondent did not allege fraud. Compare supra table 12 with table 15.

which of the disputed expenditures are being allowed, and in what amounts.  Thus, we construe these allowances against respondent.

We also reduce the $13,322.32 figure by $1,241.21, as follows:  (1) $797.21 of miscellaneous Washington area expenses, as we found that the record does not support a finding that these expenditures had a personal purpose, see <u>supra</u> Check No. 2162-- <u>Miscellaneous Washington, D.C.</u>, (2) $45 annual membership fee that we found had a business purpose, see <u>supra</u> <u>Check No. 2220-- American Express Fee</u>, and (3) $399 refund of one of the five Washington-Miami tickets, see <u>supra</u> <u>Check Nos. 2137, 2148, and 2203--Miami</u>.

We hold for respondent to the extent of $5,963.43 ($13,322.32 less $6,117.68 and less $1,241.21) and for petitioner to the extent of $7,358.89 ($6,117.68 plus $1,241.21), on this issue.

(5) Conclusions

Table 19 shows the amounts of constructive dividends Betsy received from Markette that petitioner and Betsy omitted from their 1983 through 1986 tax returns.

Table 19

| Year | Respondent's Contentions (Table 15) | Court's Holdings |
|------|------|------|
| 1983 | $10,329.90 | $6,189.79 |
| 1984 | 5,169.50 | 780.00 |
| 1985 | 12,879.74 | 9,966.71 |
| 1986 | 13,322.32 | 5,963.43 |

Petitioner does not contend that he is entitled to offsetting deductions or credits for any of those years.[30]  Thus, we conclude that respondent has shown by clear and convincing evidence that petitioner had an underpayment of tax for each of the years 1983 through 1986.

We hold for respondent on this issue.

B.  Fraudulent Intent

Respondent contends that "petitioner's returns for four consecutive years omitted substantial amounts of constructive dividend income", petitioner was "intimately aware" of the pattern of omissions, petitioner's "specialized knowledge and

_____

[30]    The parties have stipulated that petitioner and Betsy--

are entitled to credits in the above amounts [the amounts of F.I.C.A. taxes withheld from Sley Corporations' payments to Betsy] for 1983, [$2,391.91] 1984 [$2,532.59] and 1985 [$2,791.78; see supra table 3] in determining the amounts of overpayments or deficiencies to be paid with respect to their joint returns for said years.

We understand this to be an agreement relating to payments, and not an agreement affecting the determination of the "underpayment" as used in sec. 6653(b)(1).  However, this agreement would affect the amount of any additional addition to tax under sec. 6653(b)(2).

experience in the tax field" makes this awareness of greater significance, this pattern of omissions "was part of a larger pattern of tax evasion in which distributions of earnings and profits of Markette and related corporations were disguised as deductible compensation and in which petitioner had the guiding hand", and petitioner's "false and misleading statements to respondent and the Court", all lead to the conclusion that petitioner had a "fraudulent intent", in omitting the constructive dividend income.

Petitioner maintains that "Betsy managed all Grossman family affairs" and "made arrangements for all travel", during the years in issue "Betsy oversaw corporate administration" of the Sley Corporations, "Betsy gave petitioner instructions on how to carry out his duties, [regarding the Sley Corporations] and petitioner followed them", and "petitioner relied upon Betsy, Ben, Bea and Berger to allocate through reimbursements and their yearly dividend declarations between business and personal expenses". Petitioner also points out that respondent had previously audited petitioner's and Betsy's 1983 and 1985 tax returns, and respondent then determined that petitioner and Betsy had overpaid their taxes. Finally, petitioner insists that he relied on Baybrook and Berger--both of whom were highly qualified and had access to all books and records--to (1) assure the accuracy of

his and Betsy's, and the Sley Corporations', tax returns and (2) determine the amounts of Betsy's dividends.

We agree with significant portions of respondent's contentions, but conclude that respondent failed to carry the heavy burden of proof as to 1983 and 1984.

Petitioner knew that he and Betsy charged personal expenses on Markette's American Express credit cards. Petitioner oversaw the Sley Corporations' daily operations and knew that Markette paid these charges and did not identify these payments as payments of personal expenses. Petitioner knew that Berger was not retained to audit the Sley Corporations' books and records, and so Berger almost certainly would not discover that Markette paid petitioner's and Betsy's personal expenses. Petitioner, a tax lawyer familiar with constructive dividend rules, understood that he and Betsy were failing to report income on which they were taxable. Petitioner's attempts to blame the omissions on Baybrook, Berger, and Betsy are not credible; these attempts are a further indication of petitioner's fraudulent intent. We consider these elements seriatim, and then deal with other considerations.

### (1) Petitioner's Knowledge of Credit Card Charges

Firstly, petitioner went on almost all of the trips discussed in part A. If petitioner did not go with his family on

a particular vacation trip, then Betsy told petitioner of the trip.

Secondly, petitioner knew that expenses of these vacation trips were charged to Markette, because he, himself, charged many of those expenses on his Markette American Express credit card. In 1983, petitioner charged on his American Express credit card the airfare to Lake Tahoe and all the expenses associated with the Hawaii trip. On the 1983 New York City trip, all the charges were on Betsy's Markette American Express credit card, but petitioner signed the credit slips for the hotel, etc., expenses. In 1985, petitioner charged most of the expense of the Acapulco trip, the expense associated with the trip to Stamford, and all but the airline ticket portion of the expenses associated with the trip to Canada. In 1986, petitioner charged part of the expenses associated with the trips to Miami, dinner for petitioner and Betsy at the Shoreham Hotel, the charges from Lenny's Restaurant and Vista International Hilton, and part of the expenses associated with the second trip to Key West.

### (2) Petitioner's Knowledge of Payments

Petitioner knew that Markette paid for the charges on the Markette American Express credit cards, because he directed Baybrook to make those payments. Petitioner supervised Baybrook in her duties for the Sley Corporations, and she took directions,

including directions with respect to paying bills, exclusively from petitioner.

Petitioner brought the American Express invoices to Baybrook and told her which of the Sley Corporations was to pay for the charges on a particular invoice. After Baybrook prepared a check as payment, she attached the check to the invoice and returned it to petitioner for his final review. Petitioner closely reviewed each check against each invoice, as well as each transaction on each invoice. Petitioner signed most of the Markette checks to pay for the charges on the American Express invoices; Betsy signed checks when petitioner asked her to do so. In verifying the charges on the American Express invoices, petitioner checked with Betsy, on at least some occasions, to determine whether Betsy had made a particular charge. Petitioner never told Baybrook that a travel expense on an American Express invoice was a personal item, and thus was not to be paid by the Sley Corporations.

### (3) Petitioner's Knowledge of Berger's Limited Role

Petitioner brought Berger into the picture, initially to prepare the Sley Corporations' 1980 tax returns. Berger continued preparing the Sley Corporations' tax returns, petitioner's and Betsy's tax returns, and the Sley Corporations' compilation financial statements; he also calculated the amounts

of dividends necessary to avoid imposition of personal holding company taxes on the Sley Corporations.

Berger was not retained to do any audit work on behalf of the Sley Corporations. Each of Berger's compilation financial statements includes a compilation report that starts as follows:

> A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying [December 31, 1980, 1981, etc.] financial statements and[,] accordingly, do not express an opinion or any other form of assurance on them.

Because petitioner knew that Berger did not audit the Sley Corporations books--and was reminded of this in each year's compilation financial statements--petitioner knew that Berger would not discover that Markette paid petitioner's and Betsy's personal expenses. As a result, no one in the system would be likely to realize that Betsy had constructive dividends that were not reported on petitioner's and Betsy's joint tax returns.

(4) Petitioner's Knowledge of the Tax Laws

In analyzing whether some part of the underpayments of the tax was due to petitioner's fraud, we consider petitioner's background and knowledge of tax law. Scallen v. Commissioner, 877 F.2d 1364, 1370-1371 (8th Cir. 1989), affg. T.C. Memo. 1987-412; Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603; Beaver v. Commissioner, 55 T.C. 85, 93-94 (1970). As we have said, "In determining the presence

or absence of fraud, the trier of the facts must consider the native equipment and the training and experience of the party charged." <u>Iley v. Commissioner</u>, 19 T.C. 631, 635 (1952).

Petitioner is a practicing attorney with an LL.M. in taxation degree from New York University. Petitioner was a senior trial attorney in the Trial Branch of the Tax Court Litigation Division, Office of Chief Counsel, Internal Revenue Service, for 4 years. He has been in private practice, specializing in tax law, for about 20 years. Petitioner is a member of the bar of this Court.

Petitioner understands that a shareholder-taxpayer receives a constructive dividend when a corporation in which a taxpayer owns stock pays the personal expenses of that shareholder without the expectation of repayment. We take judicial notice of a case in this Court, <u>First Teachers Investment Corp. v. Commissioner</u>, T.C. Memo. 1980-302, involving constructive dividends, in which petitioner appeared as counsel for the taxpayer, and a Case before the Court of Appeals for the Fourth Circuit, <u>Clevenger v. Commissioner</u>, 826 F.2d 1379 (4th Cir. 1987), affg. T.C. Memo. 1986-149, also involving constructive dividends, in which petitioner appeared on brief for the taxpayer. <u>Petzoldt v. Commissioner</u>, 92 T.C. at 674; <u>Estate of Reis v. Commissioner</u>, 87 T.C. 1016, 1027 (1986). Further, we believe that petitioner knows that expenses can be apportioned between the business and

personal portions of a trip, because petitioner arranged for the Sley Corporations to pay for only that portion of Baybrook's trip to Florida that she spent on business (see _supra_ note 5), not her entire trip.

Petitioner's background increases our confidence that he understood that, when he told Baybrook that Markette was to pay for the travel and entertainment expenses on the Markette American Express invoices, it would result in the constructive dividends' not being reported on his and Betsy's joint tax returns. We believe that petitioner acted in bad faith, with the intention that the constructive dividends not be reported.

Petitioner points to the relatively small amounts of omitted constructive dividends, compared to the substantial amounts of income that he and Betsy reported, and substantial amounts of income taxes they paid. Compare, for example, table 19 with tables 13 and 14. The significance of large relative omissions in most fraud opinions decided for respondent is that the relative magnitude of the omissions convinced us that the omissions could not have been inadvertent. In the instant cases, petitioner's knowledge of the tax laws combines with the other elements we discuss to convince us that these omissions could not have been inadvertent. Thus, in the instant cases, the comparatively small relative magnitude of omissions does not point toward inadvertence.

(5) Petitioner's Misleading Explanations

Petitioner claims that he was merely acting as Betsy's agent in her administration and oversight of the Sley Corporations and that Betsy gave petitioner instructions on how to carry out his duties. The extension of petitioner's argument then, is that petitioner cannot be held responsible for any income that may have been omitted from petitioner's and Betsy's joint tax return because petitioner was merely acting under Betsy's control and direction. This claim is squarely contradicted by the record.

We are not concerned with whether petitioner was Betsy's agent in the sense that Betsy is bound by, or liable for, petitioner's actions. Our concern is as to petitioner's liability for his own actions. It was petitioner, not Betsy, who hired and supervised Baybrook. It was petitioner, not Betsy, who directed Baybrook as to Markette's payment of American Express invoices, knowing that those invoices included numerous charges for petitioner's and Betsy's personal benefits. It was petitioner, not Betsy, who brought Berger into the picture and who understood that Berger's limited engagement meant that (in the words of the accountants' compilation reports that accompanied the Sley Corporations financial statements) Berger would merely present "information that is the representation of management". Petitioner, thus, made and effectuated the decisions that led to the omission of constructive dividend

income from his and Betsy's joint tax returns.  Petitioner controlled the situation and knew what was happening with regard to the omitted income.  Petitioner's claim that he was merely acting for Betsy, and implicitly that any blame should be shifted from him to Betsy, is belied by the record.  The transparent falseness of petitioner's effort is itself an indicator of petitioner's fraudulent intent.  Bahoric v. Commissioner, 363 F.2d 151, 153-154 (9th Cir. 1966), affg. T.C. Memo. 1963-333; Boyett v. Commissioner, 204 F.2d at 208.

Respondent contends that petitioner's role in the Sley Corporations' payments of salaries to Betsy and Ben is significant because it "bear[s] upon his [petitioner's] attitude toward reporting and paying taxes generally."  Petitioner points out that Betsy and he reported all of Betsy's salary receipts on their joint tax returns, and contends that "Betsy's salary is neither a badge of fraud nor relevant to this case."  After examining the record in the instant case, we conclude that the most significant elements of the salary matter are (1) petitioner's role in the salary determinations and (2) petitioner's contentions regarding that role.  We do not decide whether the payments were salary or whether the payments were fraudulent.[31]

---

[31]     We note that the question of whether the amounts paid to Betsy as salary really were salary or really were dividends
                                                      (continued...)

Petitioner proposed findings of fact that he "did not participate in setting the yearly salaries paid by the Sley Corporations", that he "does not know who decided how to allocate the salaries among the Sley Corporations", and that he "believes decisions regarding salaries paid by the Sley Corporations were made by the corporations' officers."

Before the Sley Corporations were moved into Grossman & Flask facilities, Betsy and Ben did not receive salaries from the Sley Corporations. Then Betsy and Ben received salaries, but

[31](...continued)
affects petitioner's and Betsy's income taxes, not just the income taxes of the payor corporations. In particular, it affects the Schedule W deduction (sec. 221) and the I.R.A. contribution deduction (sec. 219), both of which are dealt with supra note 3, and the excise tax (sec. 4973), which is dealt with supra note 2. It also has a consequence as to the proper treatment of the amounts withheld as F.I.C.A. taxes from the amounts paid to Betsy. See supra table 3; supra note 30. However, petitioner implicitly conceded the Schedule W and I.R.A. contribution adjustments, respondent conceded the excise tax, and neither side pursued the dispute about the credit for withheld F.I.C.A. taxes.

Respondent contends that the salary arrangement was part of a "corporate tax evasion scheme" guided by petitioner, and so shows petitioner willing to commit tax fraud. At the same time, (1) respondent understands that both the Schedule W and I.R.A. deductions "turn on the question whether amounts paid to Betsy by Markette Corporation during those years represent compensation for services actually rendered", but (2) respondent does not contend that the underpayments resulting from the Schedule W and I.R.A. deductions in the instant cases are due to fraud.

In light of this apparent inconsistency in respondent's position, coupled with the above-described resolutions of the adjustments that flow from the salary issue, we conclude that it is not necessary for us to decide in the instant cases whether the payments to Betsy constituted salary or additional dividends.

only from certain of the Sley Corporations.  See supra notes 6
and 7.  Petitioner did not challenge Betsy's and Ben's testimony
that each of them was notified by petitioner when her or his
salary was set or changed, and that neither Betsy nor Ben
participated in the decision-making.  Indeed, petitioner proposed
findings of fact to the effect that Betsy and Ben did not know
who made the decision that the Sley Corporations would pay them
salaries, how the salary structure was set for the Sley
Corporations, or who decided how much their salaries would be.
The parties agree that Berger did not set the salary structure,
and that he did not participate in the setting of salary levels
at any time.  The parties agree that Berger also did not
participate in the decision to allocate the officers' salaries
among the Sley Corporations or among the officers themselves.
The parties agree that Berger did not have anything to do with
the decisions to raise and lower the salaries from year to year.
Petitioner does not suggest that Beatrice gave him instructions,
or even consulted with him, in this matter.  Harry was long dead
by the time the salaries in question began to be paid.
Petitioner does not explain how he got the salary information
that he then presented to Betsy and Ben.  That leaves petitioner
as the only person who could have made the salary decisions.[32]

---

[32]     How often have I [Sherlock Holmes] said to
         you [Dr. Watson] that when you have

                                        (continued...)

We conclude, and we have found, that petitioner set Betsy's and Ben's salaries from the Sley Corporations, at least up to early 1986. Petitioner had a substantial degree of control over many matters at the Sley Corporations. The transparent falseness of petitioner's contentions that he did not participate in the decisions and that he did not know who made the decisions as to Betsy's and Ben's salaries is itself an indicator of petitioner's fraudulent intent. Bahoric v. Commissioner, 363 F.2d at 153-154; Boyett v. Commissioner, 204 F.2d at 208.

On brief petitioner lauds Baybrook's and Berger's qualifications and abilities, and declares his reliance on them to (1) assure the accuracy of his and Betsy's, and the Sley Corporations' tax returns, and (2) determine the amounts of Betsy's dividends.

A taxpayer's reliance on his or her accountant to prepare accurate returns may indicate an absence of fraudulent intent. Marinzulich v. Commissioner, 31 T.C. 487, 492 (1958). This is so, however, only where the accountant has been supplied with all the information necessary to prepare the returns accurately. Scallen v. Commissioner, 877 F.2d at 1371; Foster v.

---

[32](...continued)
eliminated the impossible, whatever remains, however improbable, must be the truth?
[Emphasis in original.]

Doyle, "The Sign of Four", Sherlock Holmes: The Complete Novels and Stories (vol. l) 107, 139 (Bantam Books 1986).

Commissioner, 391 F.2d 727, 732-733 (4th Cir. 1968), affg. on this issue and revg. on another issue T.C. Memo. 1965-246; Estate of Temple v. Commissioner, 67 T.C. 143, 162-163 (1976).

In the instant cases, petitioner supervised Baybrook in such a manner that Baybrook was not informed of the personal nature of the charges that she was noting on the Sley Corporations books. Also petitioner knew that this meant that Berger's access to the books would not enable Berger to realize that Markette was paying petitioner's and Betsy's personal expenses.

Petitioner's effort to claim that he relied on Baybrook and Berger is belied by the record. The transparent falseness of petitioner's efforts is itself an indicator of petitioner's fraudulent intent. Bahoric v. Commissioner, 363 F.2d at 153-154; Boyett v. Commissioner, 204 F.2d at 208.

(6) Other Considerations

We believe that petitioner established a pattern that continued into 1986 with regard to constructive dividends, and there is strong evidence about his fraudulent intent with regard to the omission of that income from his and Betsy's joint tax returns. However, determinations about fraud must be made year-by-year. Drieborg v. Commissioner, 225 F.2d at 219-220; Estate of Stein v. Commissioner, 25 T.C. at 959-963. We consider at this point matters of particular significance to individual years.

(a) 1983.  Petitioner contends that the fact that an earlier audit of petitioner's and Betsy's 1983 joint tax return revealed that they overstated their income for that year indicates that petitioner lacked an intent to evade tax for 1983.  Respondent contends that because petitioner did not offer any explanation of this audit, it is impossible to draw conclusions from this audit that are relevant to determining petitioner's intent with respect to the unreported income for 1983.  Respondent also contends that the lack of evidence in the record regarding the audit conducted in 1987 should be construed against petitioner.  Respondent urges that, under the Wichita Terminal doctrine, petitioner's failure to offer further evidence of the earlier audit gives rise to the inference that any such evidence would not be favorable to petitioner.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

We agree with petitioner's conclusion.

As table 13, supra, shows, petitioner and Betsy reported a joint liability of $160,344 for 1983.  In the notice of deficiency in the instant cases, respondent determined a joint tax liability of $138,142--$22,202 less than what petitioner and Betsy reported.  In other words, respondent's determination in the notice of deficiency means that petitioner and Betsy originally overstated their 1983 tax liability by $22,202.  As a result of respondent's concessions (supra note 2), respondent now

contends, in effect, that petitioner and Betsy originally overstated their 1983 tax liability by significantly more than $22,202.

As the text preceding table 13, supra, shows, this state of affairs results from a 1987 audit that resulted in respondent's deciding that petitioner and Betsy overstated their taxable income (by $69,885) and tax liability (by $34,942). The record herein does not explain why the 1987 audit adjustment was made. The stipulated revenue agent's report does not show that this adjustment was related to any other adjustment for any other year. In this regard, the instant cases are materially different from those where a nonfraudulent tax return was made fraudulent by a later action of the taxpayer fraudulently claiming a carryback to the originally nonfraudulent year. E.g., Arc Elec. Const. Co. v. Commissioner, 923 F.2d 1005 (2d Cir. 1991), revg. T.C. Memo. 1990-30; Toussaint v. Commissioner, 743 F.2d 309 (5th Cir. 1984), affg. T.C. Memo. 1984-25. The instant cases also are materially different from those where the taxpayer unsuccessfully claimed that the original fraud was "cured" (i.e., the underpayment was eliminated, in whole or in part) by a later action of the taxpayer. E.g., Romm v. Commissioner, 245 F.2d 730, 736 (4th Cir. 1957), affg. on this issue and revg. on another issue T.C. Memo. 1956-104 (payment of correct tax liability before notice of deficiency); Gum Products, Inc. v.

Commissioner, 38 T.C. 700, 706-707 (1962) (nonfraudulent
carryback); Elmbrook Home, Inc. v. United States, 559 F.Supp. 787
(D.R.I. 1983) (nonfraudulent sec. 1341 adjustment).

Neither side has cited us to, and our research has not
disclosed, any other opinion involving the pattern of events that
we find in the instant cases for 1983.

Respondent contends that petitioner should bear the
consequences of the failure to explain on the record why the 1987
adjustment to his and Betsy's 1983 tax liability was made.
However, (1) respondent has the burden of proving fraud by clear
and convincing evidence, and (2) we are looking for an
explanation of respondent's determination, resolving respondent's
audit. We do not agree that the failure to provide the
explanation should be borne by petitioner.

On answering brief, respondent invokes the Wichita Terminal
doctrine, stating that--

> If petitioner really felt that he had such an argument
> in this case, he certainly could have testified about
> the basis of the examination and submitted himself to
> cross-examination on the point, or he could have
> offered some other independent evidence of the nature
> of the adjustments.

However, respondent overlooks the requirement of the adverse
inference rule that an uncalled witness not only must be within a
party's power to produce but also must be "peculiarly" within
that party's power to produce before such an inference may be
drawn against that party. See United States v. Rollins, 862 F.2d

1282, 1297-1298 (7th Cir. 1988).  If a witness is "equally available" to both parties and neither party calls that witness at trial, then no adverse inference is warranted.  See Kean v. Commissioner, 469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. on this issue and revg. on another issue 51 T.C. 337, 343-344 (1968).

The fact that the tax liability shown on petitioner's and Betsy's timely filed 1983 tax return is substantially greater than the tax liability determined in the notice of deficiency in the instant cases is apparent; it should be explained by respondent in a fraud case.  The issue of the audit conducted in 1987 and its impact on the question of fraud for 1983 was referred to in petitioner's pretrial memorandum.  Petitioner was called as respondent's witness, and so petitioner was available to respondent, and respondent should have dealt with the matter.  In addition, we may assume (at least, in the absence of explanation to the contrary) that respondent's records indicate the sequence of events and the names of respondent's participating agents with respect to the 1987 audit.  Thus, there is no basis for invoking the Wichita Terminal doctrine against petitioner; rather, we might fairly consider applying it against respondent.

Petitioner's and Betsy's 1983 tax return, as filed, substantially overstated their actual 1983 tax liability.  But

for respondent's 1987 audit and the resulting refund, there could not be a holding of fraud against petitioner for 1983.  For all we can tell, petitioner did not initiate that refund.  We do not decide in the instant cases whether on these facts, a taxpayer is entitled to a ruling of "no fraud" as a matter of law, but we do conclude that, on these facts, the evidence of fraud is less than "clear and convincing".

We hold for petitioner as to 1983.

(b) 1984.  The circumstances of the American Express invoices for 1984 present a special problem.  For 1984, in part I.A.(2), supra, we concluded that respondent proved by clear and convincing evidence that Betsy received from Markette a $780 constructive dividend, which petitioner and Betsy omitted from their 1984 joint tax return.  See supra table 17.  Based on the record in the instant cases, however, it is not clear that petitioner knew that Markette paid for the trip to Orlando.  Petitioner and Baybrook established the routine discussed supra (Daily Operation: 1980-March 1986) for payment of the charges on the Markette American Express invoices.  From this description, it appears that petitioner did not examine the American Express invoices in detail until they were returned to him with an attached check prepared by Baybrook.  The record is not clear as to what steps petitioner and Baybrook took to process an invoice, like the October 1984 invoice on which the airlines tickets to

Orlando appeared, which showed a net credit and not a net amount due. Because Baybrook would not have had to prepare a check as payment for the October 1984 invoice, it is not clear whether petitioner examined the October invoice in detail. If petitioner had examined the October invoice and traced the charges and payments made back to the August 1984 invoice, then petitioner would have realized that the airlines tickets to Orlando appearing on the October invoice were "paid for" with credit issued on account of the refund of charges appearing on the August invoice. It is not clear that petitioner went through such deliberation. It is not clear whether petitioner actually knew, much less intended, that Markette paid for the airlines tickets to Orlando; thus, it is not clear that petitioner knew and intended that that amount be omitted from petitioner's and Betsy's 1984 joint tax return. Respondent has failed to prove by clear and convincing evidence that the omission of the $780 constructive dividend in 1984 was due to petitioner's fraud.

As shown supra table 17, this $780 item is the only one of the items that respondent relies on as to which we have found that respondent showed by clear and convincing evidence that petitioner had an underpayment of tax for 1984. Respondent's failure to show by clear and convincing evidence that this $780 omission was fraudulent leads to the conclusion that respondent

failed to prove by clear and convincing evidence that petitioner had a fraudulent underpayment for 1984.

We hold for petitioner as to 1984.

(c) 1985. Petitioner's contentions as to 1985 are the same as those he makes for 1983. However, the material facts are different. Compare supra tables 13 and 14. Petitioner's and Betsy's tax liability for 1985 clearly is greater than the amount they reported on their 1985 tax return. We conclude that no special 1985 element detracts from our general conclusions as to petitioner's fraud.

We hold for respondent as to 1985.

(d) 1986. Petitioner points to his vastly reduced role at the Sley Corporations after March 1986 as a basis for his lack of responsibility for what occurred at the Sley Corporations. However, (1) the systems that petitioner oversaw continued to operate for a while, at least; (2) substantially all of the 1986 constructive dividends were for expenses charged on Markette's American Express credit cards while petitioner was fully in charge; (3) petitioner continued to play a role in Sley Corporations' affairs through 1986 and at least into early 1987; and (4) petitioner signed his and Betsy's 1986 joint tax return with knowledge of the foregoing. We conclude that no special 1986 element detracts from our general conclusions as to petitioner's fraud, and that some part of the $5,963.43 omitted

constructive dividend income (<u>supra</u> table 19) was omitted because of petitioner's fraud.

We hold for respondent as to 1986.

C.  Conclusions

We conclude that respondent has shown by clear and convincing evidence that petitioner intended to evade his income taxes for each of the years 1985 and 1986, which taxes petitioner knew or believed he owed, by conduct intended to conceal this income.

Accordingly, the statute of limitations does not bar respondent's assessment of deficiencies against petitioner for 1985.  Sec. 6501(c)(1).

We hold for respondent with respect to 1985, and for petitioner with respect to 1983 and 1984, on this statute of limitations issue.

II. Additions to Tax

A.  Fifty-Percent Fraud Addition--1985

In order to impose the 50-percent fraud addition to tax for 1985 under section 6653(b)(1),[33] respondent must prove, by clear

---

[33]    Sec. 6653(b) for 1985 provides, in pertinent part, as follows:

SEC. 6653.  FAILURE TO PAY TAX.

*  *  *  *  *  *  *

(b) Fraud.--

(continued...)

and convincing evidence, that petitioner has an underpayment of tax for that year, and that some part of that underpayment is due to fraud.  Sec. 7454(a); Rule 142(b).  Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried this burden of proof as to the 50-percent fraud addition to tax for 1985.

We hold for respondent on this issue with respect to 1985.

B.  Additional Amount for Portion Attributable to Fraud--1985

The additional amount added to the tax under section 6653(b)(2) is equal to 50 percent of the interest payable under

---

[33](...continued)

(1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

(2) Additional amount for portion attributable to fraud.--There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601--

(A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and

(B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

This provision was amended by sec. 1503 of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, 2742.  See infra note 35.

section 6601 and applies only to the portion of the underpayment that is attributable to fraud.  Respondent has the burden of proving, by clear and convincing evidence, what portion of the deficiency is attributable to fraud.[34]

Our analysis in part I., supra, leads us to conclude that respondent proved by clear and convincing evidence that the unreported amount for 1985 (supra table 19) was omitted from petitioner's and Betsy's joint tax return due to petitioner's fraud.

We hold for respondent on this issue with respect to the indicated amount for 1985.  (The payment described supra in note 30, shall be taken into account in determining the amount of this addition to tax.)  We hold for petitioner on this issue with respect to the remaining amount for 1985.

C.  Fraud Additions--1986

In order to impose the fraud 75-percent addition to tax or the additional addition to tax for 1986 under paragraph (1) of section 6653(b),[35] respondent must prove, by clear and convincing

_____

[34]    The 1986 amendments include a provision under which the burden of proof shifts to the taxpayer.  See sec. 6653(b)(2), set forth infra in note 35.  The statute applicable to 1985 (set forth supra in note 33) does not have any such provision, and so the general fraud burden-of-proof rules of sec. 7454(a) (supra note 24) apply for 1985.

[35]    Sec. 6653 for 1986 provides, in pertinent part, as follows:

(continued...)

---

[35](...continued)
SEC 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD.

(a) Negligence.--

(1) In general.--If any part of any underpayment (as defined in subsection (c)) is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of--

(A) 5 percent of the underpayment, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of tax).

(2) Underpayment taken into account reduced by portion attributable to fraud.--There shall not be taken into account under this subsection any portion of an underpayment attributable to fraud with respect to which a penalty is imposed under subsection (b).

\* \* \* \* \* \* \*

(b) Fraud.--

(1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

(A) 75 percent of the portion of the underpayment which is attributable to fraud, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any

(continued...)

evidence, that petitioner has an underpayment of tax for that year, and that some part of that underpayment is due to fraud. If respondent establishes that petitioner has an underpayment of tax some part of which is due to fraud, then section 6653(b)(2) shifts the burden of proof to petitioner to establish what portion of the underpayment is not attributable to fraud.  Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried respondent's burden of proof.

-----

[35](...continued)
>            extension) and ending on the date of the
>            assessment of the tax or, if earlier, the date of
>            the payment of the tax.
>
>            (2) Determination of portion attributable to
>       fraud.--If the Secretary establishes that any portion
>       of an underpayment is attributable to fraud, the entire
>       underpayment shall be treated as attributable to fraud,
>       except with respect to any portion of the underpayment
>       which the taxpayer establishes is not attributable to
>       fraud.

These provisions were added by sec. 1503(a) of TRA 86, 100 Stat. 2742, and apply to tax returns the due date of which is after Dec. 31, 1986.

The later amendments of these provisions by sec. 1015(b)(2) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 88)(Pub. L. 100-647, 102 Stat. 3342, 3569) and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89--Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant cases.

As the result of OBRA 89, the revised negligence addition to tax appears in sec. 6662, and the revised fraud addition to tax now appears in secs. 6663 and 6651(f).

In part I.B.(4), <u>supra</u>, we described our conclusion that respondent proved by clear and convincing evidence that petitioner and Betsy omitted $5,963.43 from income and that all of this was due to petitioner's fraud.  In the notice of deficiency, respondent determined that all the constructive dividend omissions were due to petitioner's fraud, but on brief respondent took the position that only certain of the travel and entertainment constructive dividends were fraudulently omitted. Compare <u>supra</u> tables 12 and 15, and text following note 29.  As to $797.21 of miscellaneous Washington area expenses, we held that respondent did not prove fraud by clear and convincing evidence; however, petitioner has failed to carry his section 6653(b)(2) burden of proof as to these expenses.  Accordingly, we hold that the fraud additions to tax for 1986 apply to so much of the underpayment as is attributable to $6,760.64 ($5,963.43 plus $797.21) of constructive income dividend omissions.

We hold for respondent as to $6,760.64; we hold for petitioner as to the remaining amount on this issue.

D.  Negligence Additions--1986

Respondent determined in the alternative that, if petitioner is not liable for part or all of the additions to tax for fraud for 1986, then petitioner is liable for negligence additions to tax under subparagraphs (A) and (B) of section 6653(a)(1). Petitioner did not address this issue on brief.  Because

petitioner has the burden of proof on the negligence issue, we conclude that petitioner conceded this issue.  See subparagraphs (4) and (5) of Rule 151(e); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Money v. Commissioner, 89 T.C. 46, 48 (1987).

The negligence addition to tax applies to those 1986 items in supra table 12, that we found had a personal purpose and with respect to which we did not sustain respondent's fraud determination or with respect to which respondent did not determine fraud.  The negligence addition to tax also applies to those 1986 items in supra table 12, the purpose of which we were unable to determine on this record; those items total $3,325.84.

We hold for respondent on this issue.

### III.  Amounts of Deficiencies

In this part of the opinion, petitioner has the burden of proving by a preponderance of the evidence that respondent erred in the notice of deficiency determinations as to matters of fact. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

### A.  Amounts of Constructive Dividends

In supra table 10, we set forth our conclusions that $10,164.71 of the disputed 1985 amounts was constructive dividends to Betsy, that $90 were Sley Corporations' business expenses, and that we could not find that the remaining $12,759.63 of disputed Markette payments fit into either

category. Petitioner failed to carry his burden of proving that respondent erred in determining that the remaining $12,759.63 constitutes unreported constructive dividend income to Betsy.

In _supra_ table 12, we set forth our conclusions that $8,173.56 of the disputed 1986 amounts were constructive dividends to Betsy, that $160.22 were Sley Corporations' business expenses, and that we could not find that the remaining $3,325.84 of disputed Markette payments fit into either category. Petitioner failed to carry his burden of proving that respondent erred in determining that the remaining $3,325.84 constitutes unreported constructive dividend income to Betsy.

We hold for respondent on this issue, except that we hold for petitioner as to $90 for 1985 and as to $160.22 for 1986.

B. Interest Deduction

Respondent contends that petitioner's and Betsy's 1987 joint tax return overstated an itemized personal interest deduction by $8,559. Petitioner contends that the interest deduction was properly taken for 1987. The deduction in issue stems from the $13,167.96 interest payment Betsy made to Markette.

We agree with respondent's conclusion.

For 1987, section 163[36] allowed a deduction, subject to the

---

[36]     Sec. 163 provides, in pertinent part, as follows:

SEC. 163.   INTEREST.

   (a) General Rule.--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

   *   *   *   *   *   *   *

   (d) Limitation on Investment Interest.--

   *   *   *   *   *   *   *

      (6) Phase-in of disallowance.--In the case of any taxable year beginning in calendar years 1987 through 1990--

   *   *   *   *   *   *   *

      (B) Applicable percentage.--for purposes of this paragraph, the applicable percentage shall be determined in accordance with the following table:

| In the case of taxable years beginning in: | The applicable percentage is: |
|---|---|
| 1987 . . . . . . . . . . . . . . . . . . . . . | 35 |
| 1988 . . . . . . . . . . . . . . . . . . . . . | 60 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 80 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 90 |

   *   *   *   *   *   *   *

   (h) Disallowance of Deduction for Personal Interest.--

   *   *   *   *   *   *   *

      (2) Personal interest.--For purposes of this subsection, the term "personal interest" means any interest allowable as a deduction under this chapter * * *

   *   *   *   *   *   *   *

(continued...)

limitations of subsections (d) and (h), for personal interest paid during the taxable year in the amount of 65 percent of the interest paid. ($13,167.96 times 65 percent is $8,559.17.) A cash-basis taxpayer properly takes a deduction for interest for the year in which the interest is paid. Sec. 461(a); sec. 1.461-1(a), Income Tax Regs.; e.g., Heyman v. Commissioner, 652 F.2d 598 (6th Cir. 1980), affg. 70 T.C. 482 (1978). Delivery of a check[37] to the payee, not deposit of the check by the payee, constitutes payment for purposes of determining the year in which a sum is deductible by a cash-basis taxpayer. Estate of Bradley v. Commissioner, 19 B.T.A. 49 (1930), affd. 56 F.2d 728 (6th Cir. 1932); see Weber v. Commissioner, 70 T.C. 52, 57 (1978). In the instant cases, the parties do not dispute whether the interest

---

[36](...continued)
        (6) Phase-in of limitation.--In the case of any taxable year beginning in calendar years 1987 through 1990, the amount of interest with respect to which a deduction is disallowed under this subsection shall be equal to the applicable percentage (within the meaning of subsection (d)(6)(B)) of the amount which (but for this subsection) would have been so disallowed.

Although the year before us on this issue is 1987, we apply the statute as amended in 1988, because sec. 1005(c)(9) of the TAMRA 88, Pub. L. 100-647, 102 Stat. 3342, 3392, amended sec. 163(h)(6) retroactively to taxable years beginning after Dec. 31, 1986. See TAMRA 88, sec. 1019(a), 102 Stat. at 3593; TRA 86, sec. 511(e), 100 Stat. at 2249.

[37] When a check is mailed, as opposed to being hand delivered as in the instant case, the mailing of the check, properly addressed, generally constitutes delivery of that check to the addressee. See, e.g.; Griffin v. Commissioner, 49 T.C. 253, 261 (1967).

payment was made, but when. Also, no question is raised as to acceptance of Betsy's check, and presentation to and payment by the drawee bank. See <u>Weber v. Commissioner</u>, 70 T.C. at 57-58. Also, no question is raised as to Brown's being an appropriate agent of Markette for purposes of accepting delivery. <u>Broussard v. Commissioner</u>, 16 T.C. 23 (1951).

Thus, the question of whether petitioner and Betsy overstated an interest deduction for 1987 turns on whether Betsy delivered her check, dated December 22, 1987 (<u>Griffin v. Commissioner</u>, 49 T.C. 253, 261 (1967)), to Markette's bookkeeper, Brown, in 1987 or in 1988.

Both Betsy and Brown testified on this matter; their testimony conflicted. We do not believe that either of them lied, but clearly at least one of them misremembered what had occurred during the turmoil when the Sley Corporations moved out of the Grossman & Flask sublet office space. All the other evidence in the record is consistent with the testimony of both Betsy and Brown. In effect, the evidence is in equipoise. Thus, petitioner failed to carry his burden of proving that it is more likely than not that respondent erred with respect to this adjustment. See <u>Brookfield Wire Co., Inc. v. Commissioner</u>, 667 F.2d 551, 553 n.2 (1st Cir. 1981), affg T.C. Memo. 1980-321; <u>Deskins v. Commissioner</u>, 87 T.C. 305, 322-323 n.17 (1986).

We hold for respondent on this issue.[38]

#### IV.  Innocent Spouse Relief

Petitioner contends that he is entitled to innocent spouse relief for 1986 under section 6013(e), because he separated from Betsy in September of that year and did not see Markette's 1986 tax return.  Respondent contends that petitioner is not entitled to innocent spouse relief.

We agree with respondent.

Section 6013(a) permits a husband and wife to elect to file a joint tax return.  Together with section 1(a), this joint tax return option is a valuable privilege, which ordinarily operates to lower the tax liability for the income reported on the joint tax return.  The price taxpayers must pay for this benefit is joint and several liability.  Sec. 6013(d)(3); Stevens v. Commissioner, 872 F.2d 1499, 1503 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Murphy v. Commissioner, 103 T.C. 111, 117 (1994); Bokum v. Commissioner, 94 T.C. 126, 151-152 (1990), affd. 992

---

[38]     Ordinarily, when the item should be deductible in one of two years and both of these years are before us, a taxpayer does not lose the deduction entirely merely because of failure to prove which of the two years is the correct one.  However, in the instant cases the interest deduction is properly an item of Betsy's, and petitioner and Betsy did not file a joint tax return for 1988.  Accordingly, petitioner's failure to carry his burden of proof for 1987 means that he has lost the deduction entirely, even though Betsy apparently would be entitled to a 1988 deduction on account of the interest payment.

F.2d 1132 (11th Cir. 1993); Pesch v. Commissioner, 78 T.C. 100, 129-130 (1982).

Under section 6013(e),[39] however, a spouse may be relieved of this joint liability for a year only if certain requirements are met for that year.  The putative innocent spouse must show the following:  (1) A joint income tax return was filed for the

---

[39]     Sec. 6013(e) provides, in pertinent part, as follows:

SEC. 6013.  JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

* * * * * * *

(e) Spouse Relieved of Liability in Certain Cases.--

(1) In general.--Under regulations prescribed by the Secretary, if--

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse established that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

year (sec. 6013(e)(1)(A)); (2) on this tax return there is a substantial understatement of tax (sec. 6013(e)(1)(B)); (3) this substantial understatement of tax is attributable to grossly erroneous items (sec. 6013(e)(1)(B)); (4) the grossly erroneous items are items of the other (the putative "guilty") spouse (sec. 6013(e)(1)(B)); (5) when the tax return was signed, the putative innocent spouse did not know, and had no reason to know, that there was this substantial understatement of tax (sec. 6013(e)(1)(C)); and (6) it is inequitable to hold the putative innocent spouse liable for the tax deficiency that is attributable to this substantial understatement of tax (sec. 6013(e)(1)(D)).

The spouse seeking relief has the burden of proof on each of these requirements. Rule 142(a); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. at 138. Because the statute is phrased in the conjunctive, failure to prove any one of the requirements will prevent the taxpayer from qualifying for relief. Hayman v. Commissioner, 992 F.2d 1256, 1260 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Bokum v. Commissioner, 992 F.2d at 1134, 94 T.C. at 138; Clevenger v. Commissioner, 826 F.2d at 1382.

These factors, taken together with the well-established principle that exemptions from taxation are to be narrowly construed, place a significant burden on the taxpayer. United

States v. Stewart, 311 U.S. 60, 71 (1940); Matthews v. Commissioner, 907 F.2d 1173, 1174, 1178 (D.C. Cir. 1990), affg. 92 T.C. 351, 361 (1989); Bokum v. Commissioner, 94 T.C. at 155, and cases cited therein.

The parties agree that requirements (1) through (4) have been satisfied. The parties dispute only whether (5) in signing the 1986 joint tax return, petitioner knew or had reason to know that there was a substantial understatement of tax, and (6) it is inequitable to hold petitioner liable for the tax deficiency that is attributable to the substantial understatement of tax.

In part I.C., supra, we concluded that petitioner knew and intended that Betsy had constructive dividend income that was omitted from petitioner's and Betsy's 1986 joint tax return.

Further, petitioner enjoyed a large number of the trips for which he caused Markette to pay. Under these circumstances, it is not inequitable to hold petitioner liable for the resulting tax deficiency. Clevenger v. Commissioner, 826 F.2d at 1382.

We hold for respondent on this issue.

To take account of the foregoing,[40]

        <u>Decisions will be entered</u>

        <u>under Rule 155</u>.

---

[40] In the notices of deficiency, respondent made determinations as to the alternative minimum tax for 1984, 1987, and 1988. Petitioner asserted error with regard to adjustments to income for 1984 and 1987 and thus asserted error with regard to the alternative minimum tax, a function of the adjustments to income. Petitioner conceded liability with regard to the alternative minimum tax for 1988. Our redeterminations with regard to the adjustment to income may have arithmetic effects on the application and calculation of the alternative minimum tax; they are to be dealt with in the computations under Rule 155.